kwiktag®   026 455 528

```
_____ FILED    ___ LODGED
_____ RECEIVED  ___ COPY

        APR 13 2007

CLERK U S DISTRICT COURT
   DISTRICT OF ARIZONA
BY _____ P DEPUTY
```

William J. Maledon, 003670
Brett L. Dunkelman, 006740
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
E-mail: wmaledon@omlaw.com
E-mail: bdunkelman@omlaw.com

Larry D. Carlson, *admitted pro hac vice*
Barton E. Showalter, *admitted pro hac vice*
Christopher W. Kennerly, *admitted pro hac vice*
James W. Bristow, *admitted pro hac vice*
Russell J. Crain, *admitted pro hac vice*
Baker Botts LLP
2001 Ross Avenue, Suite 600
Dallas, TX 75201-2980
(214) 953-6500

Attorneys for Ericsson Inc. and Cingular Wireless LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ericsson Inc. and Cingular Wireless LLC, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>Freedom Wireless, Inc., )<br><br>Defendant. ) | No. CV06-1935 PHX JAT<br><br>**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS OF FREEDOM WIRELESS, INC.**<br><br>**FILED UNDER SEAL** |

Freedom Wireless' motion to dismiss relies entirely upon the Federal Circuit's "reasonable apprehension of imminent suit" test as set forth in *Teva Pharm. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324 (Fed. Cir. 2005). The motion was ill-founded even under the then-applicable *Teva* standard. After Freedom Wireless filed its motion, however, the United States Supreme Court issued its decision in *MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764 (Jan. 9, 2007), and the Federal Circuit issued its decisions in *SanDisk Corp. v. STMicroelectronics, Inc.*, 2007 WL 881008 (Fed. Cir. March 26, 2007), and *Teva Pharm., Inc. v. Novartis Pharm., Inc.*, 2007 WL 942201

73

(March 30, 2007). Each of these cases expressly repudiated the "reasonable apprehension" test in general and *Teva* in particular.

Instead of the "reasonable apprehension" test, *MedImmune* holds that the justiciability of patent declaratory judgment actions should be determined by applying the time-honored "totality of the circumstances" standard of *Aetna Life Ins. v. Haworth*, 300 U.S. 227 (1937), and *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270 (1941). In *SanDisk,* the Federal Circuit explained in detail why the "Supreme Court's opinion in *MedImmune* represents a rejection of our reasonable apprehension of suit test," 2007 WL 881008 at *7, and then applied the totality of the circumstances standard. That court did so again several days later in *Novartis*, 2007 WL 942201 at *4-*5.

Under the *MedImmune-SanDisk* standard, a case or controversy clearly exists between Plaintiffs and Freedom Wireless regarding the patents in suit. Nor is there any basis for Freedom Wireless' request that the Court decline jurisdiction in this case, as doing so would conflict directly with the letter and intent of the long-standing first-to-file rule.

## I.    Factual Background.

Cingular Wireless LLC ("Cingular") is a wireless carrier. One component of its business is the provision of pre-paid wireless service, which entails a subscriber paying in advance and being able to receive wireless telephone service only if there is a positive balance in the subscriber's account. Berinhout Dec. ¶ 3 (attached as Exhibit A). Switches in the Cingular network access a platform provided by a company like Boston Communications Group, Inc. ("BCGI") or Ericsson Inc. ("Ericsson"). *Id.* The platform handles accounting and instructs the switches how to deal with calls. *Id.* Historically, Cingular used a platform provided by BCGI and a communications protocol referred to as TDMA *Id.* The BCGI platform worked only with a TDMA network. *Id.* In 2001, Cingular began using a communications protocol referred to as GSM, which allowed carriers to more easily provide their subscribers with advanced

2

1   features. *Id.* At that time, Cingular also began using a platform provided by Ericsson

2   that was specially designed for networks employing the more advanced GSM

3   protocol. *Id.* The Ericsson platform does not work with the older TDMA networks.

4   *Id.*

5       In the litigation Freedom Wireless refers to as *Freedom Wireless I*, Freedom

6   Wireless sued BCGI, Cingular, and several other wireless carriers for alleged

7   infringement of two of its patents, U.S. Patents 5,722,067 and 6,157,823 (the "'067"

8   and "'823 Patents"). *Id.* ¶ 4. This case was tried to a jury during March, April, and

9   May 2005. On May 20, 2005, the Boston jury rendered its verdict finding in favor of

10  Freedom Wireless and awarding damages of about $128 million. *Id.*

11      *Freedom Wireless I* focused on pre-paid wireless services of Cingular and

12  other wireless carrier defendants who used a platform provided by BCGI. *Id.* ¶ 5.

13  Freedom Wireless, however, made it clear to Cingular, through statements made and

14  positions taken, before and during trial, that its claims of infringement "were not

15  limited to the Cingular services that made use of BCGI systems," but "were broad

16  enough to include the Cingular services based on Ericsson systems." *Id.* Indeed,

17  throughout the litigation, Freedom Wireless took the position that its patents were

18  broad enough to cover any network-based pre-paid system that did not require the use

19  of an access or PIN code. Berinhout Dep., pp. 58-60 (attached as Exhibit D). In

20  addition, during his trial testimony, Freedom Wireless' President, Larry L. Day,

21  explained Freedom Wireless' policy of suing any pre-paid wireless service provider

22  who refused to agree to a patent license. Exhibit C.

23      During the early 2005 trial of *Freedom Wireless I*, Cingular's Neal Berinhout

24  had several discussions with Robert Pressman, one of the lawyers representing

25  Freedom Wireless, concerning the possibility of Freedom Wireless settling with

26  Cingular. Berinhout Dec. ¶ 6. One scenario they discussed was Cingular obtaining a

27  full release for past acts and a fully paid up license to the Freedom Wireless '067 and

28  '823 Patents. *Id.* By this time, Freedom Wireless was aware that Cingular was using

a platform provided by Ericsson in connection with its pre-paid wireless services. Affidavit of Larry L. Day ¶ 21 (attached to Motion to Dismiss).  In fact, the Ericsson platform was the only non-BCGI system Freedom Wireless was aware that Cingular was using.  Pressman Dep., p. 23 (attached as Exhibit E).  During those discussions, Mr. Pressman informed Mr. Berinhout of Freedom Wireless' belief that Cingular's use of the Ericsson system infringed Freedom Wireless' patents and that Cingular's exposure, therefore, exceeded its use of the BCGI system.  Mr. Pressman then proposed a license arrangement which would cover Cingular's use of the Ericsson platform in exchange for a large royalty payment.  If Cingular did not obtain such a license, Mr. Pressman explained, Freedom Wireless would sue Cingular and Ericsson for patent infringement.  Berinhout Dep., pp. 76-78; 59-66.

Mr. Berinhout told Mr. Pressman that because Cingular believed Ericsson owed it indemnity for any infringement claim based on the Ericsson platform, a full settlement, one that included claims based on the Ericsson platform, "would have to involve Ericsson."  Berinhout Dec. ¶ 6.  Mr. Berinhout advised Ericsson about his discussions with Mr. Pressman.  *Id.* ¶ 7.  Mr. Berinhout asked Ericsson if it would participate in a mediation with Freedom Wireless.  Ericsson declined.  *Id.*; Han Dec. ¶ 3 (attached as Exhibit B).  Mr. Berinhout then "told Mr. Pressman that absent Ericsson's participation in the settlement discussions, settlement would have to be limited to the BCGI systems."  Berinhout Dec. ¶ 7.

Immediately following the May 20, 2005, jury verdict in its favor, Freedom Wireless issued a press release in which it said that "'[t]his verdict sends a message to these defendants ***and any others who have been infringing these patents*** that Freedom Wireless will pursue its rights to the fullest.'"  Berinhout Dec. ¶ 8 (emphasis added); Complaint Ex. D.  This press release "reinforced [Mr. Berinhout's] belief that Freedom Wireless would eventually sue Cingular for its use of the Ericsson systems."  Berinhout Dec. ¶ 8.

On June 28, 2005, Ericsson's Mr. Han saw an article published in *Wireless Weekly Magazine* concerning BCGI and the jury verdict in *Freedom Wireless I*. Han Dec. ¶ 6. This article said that the jury verdict in favor of Freedom Wireless "could trouble other vendors as well. . . . [T]he industry should be fearful because this judgment covers such a broad description of prepaid." *Id.* Particularly noteworthy to Mr. Han were the statements that "Ericsson also makes a pre-paid solution" and that Cingular was "in the process of moving its TDMA [BCGI] subscribers to GSM [Ericsson]." *Id.* A few months later, on November 3, 2005, Mr. Han saw an article by the Yankee Group saying that Freedom Wireless "has already filed suit against Nextel and Alltel, and the May 2005 decision could lead to action against other vendors and service providers, ***including Ericsson*** . . . ." *Id.* ¶ 7 (emphasis added); Complaint Ex. E. These articles "reinforced [Mr. Han's] belief that when [*Freedom Wireless* I] was resolved, Freedom Wireless would sue Cingular and Ericsson for the Ericsson systems." Han Dec. ¶¶ 6-7.

As Mr. Pressman explains in his declaration, BCGI utilized the services of David Kiernan to help it settle *Freedom Wireless I*. Affidavit of Robert A. Pressman ¶ 5 (attached to Motion to Dismiss). In addition to trying to settle Freedom Wireless' claims against BCGI, Mr. Kiernan tried to achieve – and eventually succeeded in achieving – a settlement that included the wireless carrier defendants (but only with respect to their use of a BCGI platform).

On May 19, 2006, Mr. Kiernan advised Mr. Berinhout that he had reached a global settlement with Freedom Wireless that included Cingular and the other wireless carrier defendants, but that the settlement covered use of BCGI platforms only and "would not protect Cingular with respect to pre-paid services from [other] providers." Berinhout Dec. ¶ 9. Mr. Kiernan told Mr. Berinhout that the settlement would not protect Cingular "with respect to pre-paid services from providers other than BCGI" and that "Cingular might have to deal with Freedom Wireless infringement claims against Cingular" based on non-BCGI platforms. *Id.*

1    Before the settlement of *Freedom Wireless I* was finalized, Freedom Wireless

2  proposed a standstill agreement with respect to Freedom Wireless' infringement

3  claims based on use of non-BCGI systems. *Id.* ¶ 10. The standstill agreement that

4  Freedom Wireless proposed states in relevant part:

5

6    Cingular Standstill and Negotiation Period.

7    a) During the period commencing on the Effective Date
   and ending on December 31, 2006 (the "Standstill
8    Period"), Cingular and Freedom will negotiate in good
   faith to resolve ***claims or disputes that Freedom may***
9    ***have that prepaid wireless systems used in the past or***
   ***future by Cingular, other than the BCGI Prepaid***
10   ***Wireless System, do or may infringe the Freedom***
   ***Patents.*** During the Standstill Period, Freedom will not
11   initiate any litigation claiming infringement by Cingular
   of any Freedom Patents and, in consideration of that
12   forbearance, Cingular shall not challenge the Freedom
   Patents pursuant to paragraph 11(b) directly or through or
13   in conjunction with any third party. . . . d) If Freedom and
   Cingular are unable to resolve all outstanding disputes by
14   the end of the Standstill Period, unless otherwise agreed
   by Freedom and Cingular, all subsequent disputes
15   between Freedom and Cingular shall be resolved by an
   action filed with the United States District Court for the
16   District of Massachusetts . . ..

17

18  *Id.* (emphasis added). "From the language of this standstill agreement proposed by

19  Freedom Wireless, [Mr. Berinhout] understood that Freedom Wireless contended that

20  Cingular pre-paid wireless services based on Ericsson systems infringed the Freedom

21  Wireless patents, that Freedom Wireless intended to assert an infringement claim

22  against Cingular for the Ericsson systems, and that Freedom Wireless wanted to

23  ensure that venue of that infringement claim would be in the Boston district court."

24  *Id.*[1] Cingular declined to enter into the Freedom Wireless proposed standstill

25  agreement. *Id.*

26    BCGI's press release concerning settlement of *Freedom Wireless I*, expressly

27  authorized by Freedom Wireless, emphasized that the settlement did not resolve

28

---

[1]    At his deposition, Mr. Pressman was unable to explain why he drafted such
threatening language in the standstill provision. Pressman Dep., pp. 41-42.

1   infringement claims based on wireless carriers' use of non-BCGI platforms, such as

2   Cingular's use of the Ericsson platform. *Id.* ¶ 9; Complaint Ex. C.

3          Without citation to any written agreement or exchange of correspondence or

4   email, Freedom Wireless asserts in a footnote to its motion to that the parties agreed

5   "that all communications made during settlement negotiations would be confidential

6   and would not be used for any purpose." Motion at 10 n.10. Cingular did agree that

7   such discussions are subject to Federal Rule of Evidence 408 and are, therefore, not

8   "admissible . . . to prove liability for, invalidity of, or amount of a claim that was

9   disputed as to validity or amount." Fed. R. Evid. 408(a); Berinhout Dec. ¶ 12. There

10  was, however, no agreement that such discussions "would not be used for any

11  purpose." Berinhout Dec. ¶ 12. Mr. Han concurs that Ericsson never entered into any

12  such agreement. Han Dec. ¶ 9.

13         While Mr. Berinhout and Mr. Han were convinced that Freedom Wireless

14  would sue Cingular based on its use of the Ericsson platform, they believed that

15  Freedom Wireless would likely not sue until after *Freedom Wireless I* had finally

16  concluded for the reasons explained in their declarations. Berinhout Dec. ¶ 11; Han

17  Dec. ¶ 7. For example, Freedom Wireless' proposal of the standstill agreement

18  reinforced Mr. Berinhout's belief that Freedom Wireless wanted to first resolve

19  *Freedom Wireless I* before suing Cingular based on its use of the Ericsson systems.

20  Berinhout Dec. ¶ 11.

21         Ericsson and Cingular filed this declaratory judgment action on August 8,

22  2006. They held off serving Freedom Wireless until final orders were entered by the

23  Court of Appeals for the Federal Circuit and the District of Massachusetts wrapping

24  up *Freedom Wireless I*, in order to avoid any risk of disrupting consummation of the

25  settlement. *Id.* ¶ 13.

26         On November 30, 2006, the day before it filed its Motion to Dismiss in this

27  case, Freedom Wireless filed the infringement action that Ericsson and Cingular fully

28  anticipated it would file against them. *Freedom Wireless, Inc. v. Cingular Wireless*

1   *LLC and Ericsson Inc.*, No. 2-06-CV-505 (E.D. Tex., Marshall Division). In the

2   Texas case, Freedom Wireless claims that Cingular's use of the Ericsson platform to

3   deliver pre-paid wireless services infringes its '067 and '823 Patents, the two patents

4   asserted in *Freedom Wireless I*, plus a third, closely related patent, U.S. Patent No.

5   6,236,851. Ericsson and Cingular have moved to transfer the Texas case to this Court

6   based on the first-to-file rule.

7   **II.     This Court Possesses Subject Matter Jurisdiction.**

8             As noted above, Freedom Wireless relies entirely upon the Federal Circuit's

9   "reasonable apprehension of imminent suit" test expressly repudiated by the Supreme

10  Court in *MedImmune* and by the Federal Circuit in *SanDisk* and *Novartis*.[2] In

11  *MedImmune*, the Supreme Court re-affirmed its long-standing principle that a

12  justiciable case or controversy can exist in the absence of a likelihood of litigation

13  against the declaratory judgment plaintiff, imminent or otherwise. 127 S.Ct. at 774 n.

14  11. In *SanDisk*, the Federal Circuit held that a justiciable case or controversy existed

15  even where the patent owner affirmatively represented that it had no intention of

16  suing the declaratory judgment plaintiff. 2007 WL 881008 at *9.

17            At issue in *MedImmune* was whether subject matter jurisdiction existed to

18  permit a patent licensee, while paying royalties to the licensor and not in breach of the

19  license agreement, to bring a declaratory judgment to challenge the validity of the

20  licensed patents and to determine whether the products for which the licensee was

21  paying royalties infringed the patents. The Federal Circuit applied its "reasonable

22  apprehension of litigation" test to conclude that there was no justiciable case or

23  controversy. Because MedImmune was not in breach of the license agreement, the

24  Federal Circuit reasoned, it could have no reasonable apprehension of being sued by

25  the patentee/licensor and therefore there was no justiciable case or controversy.

26

27  _____

28  [2]      Although the much more stringent "reasonable apprehension of imminent suit"
test is no longer applicable, on these facts Freedom Wireless' motion would fail even
under that test.

1  *MedImmune, Inc. v. Genentech, Inc.*, 427 F.3d 958, 963-65 (Fed. Cir. 2005).  The

2  Supreme Court reversed in an eight-to-one decision.

3         The Supreme Court concluded that the Federal Circuit's "reasonable-

4  apprehension-of-suit test" was inconsistent with Supreme Court precedent, noting that

5  at least three prior Supreme Court decisions had sustained subject matter jurisdiction

6  in the absence of any likelihood of a lawsuit being initiated by the declaratory

7  judgment defendant against the plaintiff.  127 S. Ct. at 774 n.11.  Instead of the rigid,

8  bright-line standard employed by the Federal Circuit and advocated here by Freedom

9  Wireless, the Supreme Court held that the proper standard, in effect for 70 years, is as

10  follows:

11         *Aetna* and the cases following it do not draw the brightest of lines
           between those declaratory-judgment actions that satisfy the case-or-
12         controversy requirement and those that do not.  Our decisions have
           required that the dispute be "definite and concrete, touching the legal
13         relations of parties having adverse legal interests"; and that it be "real
           and substantial" and "admi[t] of specific relief through a decree of a
14         conclusive character, as distinguished from an opinion advising what
           the law would be upon a hypothetical state of facts" . . . . "Basically, the
15         question in each case is whether the facts alleged, under all the
           circumstances, show that there is a substantial controversy, between
16         parties having adverse legal interests, of sufficient immediacy and
           reality to warrant the issuance of a declaratory judgment."
17

18  127 S.Ct. at 771 (citations omitted).

19         After unequivocally concluding that *MedImmune* had repudiated its prior

20  "reasonable apprehension" test, the Federal Circuit in *SanDisk* held that a justiciable

21  case or controversy was established on the basis of license negotiations (which the

22  patent owner alleged were settlement negotiations) in which the patent owner sought a

23  royalty based upon the declaratory judgment plaintiff's manufacture and sale of

24  particular, identified products.  2007 WL 881008 at *9.  In *Novartis*, the Federal

25  Circuit stressed that the totality of facts and circumstances must be examined.  It also

26  explained that determining whether subject matter jurisdiction is present for a

27  declaratory judgment action is no different than determining whether the same

28

underlying actions would create subject matter jurisdiction for a patent infringement action brought by the patent owner.  2007 WL 942201 at *7.

As a result of *MedImmune, SanDisk*, and *Novartis,* therefore, all Cingular and Ericsson must do to establish a justiciable case or controversy is to demonstrate that, under the totality of the facts and circumstances, a real and not hypothetical dispute existed as of August 2006 with respect to the patents in suit.  It is sufficient alone that Freedom Wireless sought from Cingular a patent royalty with respect to Cingular's use of the Ericsson platform and that Plaintiffs dispute that Freedom Wireless is entitled to any such royalty.

Apart from relying upon the since-repudiated "reasonable apprehension of imminent suit" test, Freedom Wireless' motion contains a number of additional legal errors:

First, Freedom Wireless errs in arguing that each particular event or statement on which Cingular and Ericsson rely should be examined independently to determine whether that particular event or statement alone is sufficient to create a justiciable case or controversy.  The Federal Circuit specifically rejected this methodology in *Novartis*, 2007 WL 942201 at *7.  Instead, this Court must examine the *totality* of the circumstances.  *E.g., MedImmune*, 127 S.Ct. at 771.

Second, Freedom Wireless contends that the previous litigation Freedom Wireless brought to enforce these very patents against Cingular and other prepaid wireless service providers who used the BCGI platform is somehow irrelevant in determining the existence of a justiciable case or controversy.  Even under the now-repudiated "reasonable apprehension" test, the Federal Circuit has not hesitated to find the existence of a justiciable case or controversy based upon (1) the existence of previous litigation between the parties relating to similar technology arising under other patents or other legal theories, *e.g., Novartis*, 2007 WL 942201 at *9; *Plumtree Software, Inc. v. Datamize, LLC*,  473 F.3d 1152, 1159-60 (Fed. Cir. 2006); *Vanguard Research, Inc. v. PEAT, Inc.,* 304 F.3d 1249, 1255 (Fed. Cir. 2002); *Goodyear Tire &*

1  *Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953, 955-56 (Fed. Cir. 1987); and/or (2)

2  statements the patentee has made to third parties in other litigation involving the same

3  or related technology or patents, *e.g., Vanguard Research*, 304 F.3d at 1255;

4  *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 837-38 & n. 9 (Fed.

5  Cir. 1988).

6       Similarly, Freedom Wireless is wrong when it contends that press releases or

7  press reports about its patent enforcement activities are irrelevant.  Evidence that the

8  patentee is engaged in a course of conduct that shows a willingness to enforce its

9  intellectual property rights is highly relevant in determining the existence of a case or

10  controversy.  *E.g., Vanguard Research,* 304 F.3d at 1255; *Goodyear*, 824 F.2d at 956;

11  *Dentsply Int'l, Inc. v. Centrix, Inc.*, 553 F. Supp. 289, 293 (D. Del. 1982) (patent

12  owner's letters to the industry announcing intention to enforce its patents); *Sigma-Tau*

13  *Industrie Farmaceutiche Reunite S.P.A. v. Lonza, Ltd.*, 36 F. Supp.2d 26, 30 n.5

14  (D.D.C. 1999) (same).

15       Fourth, contrary to Freedom Wireless' position (*see* Motion at 15), once a

16  justiciable controversy has been created, subject matter jurisdiction does not

17  evaporate with the passage of time.  Indeed, the Federal Circuit has recently squarely

18  rejected Freedom Wireless' very argument.  *Plumtree Software*, 473 F.3d at 1159.

19  Once a justiciable controversy has been created, the only way the patentee may

20  eliminate it is to provide the declaratory judgment plaintiff with a written covenant

21  not to sue.  *Id.*; *see also Sierra Appl. Scis., Inc. v. Advanced Energy Indus., Inc.*, 363

22  F.3d 1361, 1374-77 (Fed. Cir. 2004) (patent owner's letters to declaratory plaintiffs

23  four years before filing of lawsuit, when considered with subsequent communications,

24  are highly relevant in finding reasonable apprehension of suit).[3]

25

26

_____

27  [3]    As a result, to the extent Freedom Wireless' characterization of *Citizen Elecs. Co. v. Osram GmbH*, 377 F. Supp. 2d 149, 155-56 (D.D.C. 2005), is even accurate,

28  which it is not, such a reading must be disregarded in light of the Federal Circuit's controlling authority to the contrary in *Plumtree Software* and *Sierra*.

Fifth, Freedom Wireless also misstates the law when it appears to contend (Motion at 7-8) that Ericsson and Cingular may not rely upon any testimony or facts that Freedom Wireless disputes. In addressing disputed factual issues relating to jurisdiction, the Federal Circuit has employed an analysis akin to that used for summary judgment. In the absence of an evidentiary hearing, a court may not make factual determinations, but instead must resolve all doubts over pertinent facts in favor of the declaratory judgment plaintiff and may do nothing more than require the declaratory plaintiff to establish a *prima facie* case. *E.g.*, *Vanguard Research*, 304 F.3d at 1254; *Goodyear Tire*, 824 F.3d at 954-55; *see also Elecs. for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1349 (Fed. Cir. 2003). Simply put, Freedom Wireless cannot ask this Court to resolve factual disputes (particularly witness credibility) in the absence of an evidentiary hearing.

Sixth, mischaracterizing dicta in a personal jurisdiction case, Freedom Wireless contends (Motion at 10-11 & n. 11) that license and settlement communications are inadmissible to establish the existence of a case or controversy. The Federal Circuit specifically rejected this argument in *SanDisk*, 2007 WL 881008 at *2 n. 1, concluding that Fed.R.Evid. 408 does not bar the use of such communications to establish subject matter jurisdiction. Even before *SanDisk*, the Federal Circuit has found statements made during settlement or licensing discussions to be sufficient to establish a case or controversy, even when the patent owner demanded that such discussions not be used as the basis for a declaratory judgment action. *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 808-813 (Fed. Cir. 1996). Moreover, there was no agreement of the sort described by *dicta* in *SanDisk* – *i.e.*, a "suitable confidentiality agreement" that the settlement negotiations and documents could not be used as the predicate for a declaratory judgment action.

Seventh, Freedom Wireless overstates the law when it contends that this Court may not even consider the fact that, the day before it filed its motion to dismiss, Freedom Wireless sued Cingular and Ericsson for patent infringement in the Eastern

1    District of Texas. As the Federal Circuit has explained, "[a]lthough it is the situation

2    at the time suit was filed that establishes the existence *vel non* of an actual

3    controversy, subsequent events can reinforce the correctness of the conclusion." *BP*

4    *Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 980 (Fed. Cir. 1993) (citations

5    omitted); *accord C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874, 881 (Fed. Cir. 1983).

6           Cingular and Ericsson have alleged facts more than sufficient to demonstrate

7    that there is a justiciable controversy under the *MedImmune-SanDisk* standard.  When

8    this declaratory judgment action was filed in August 2006, the parties' dispute over

9    the patents-in-suit was concrete and not abstract, it was real and substantial, it was

10   between parties with adverse legal interests, and a declaratory judgment could resolve

11   the dispute.  During *Freedom Wireless I* and in a press release, Freedom Wireless

12   unequivocally asserted its position that the scope of the patents-in-suit was

13   sufficiently broad to cover prepaid wireless systems such as Cingular's use of the

14   Ericsson platform and that it would continue to assert its patents against those in the

15   prepaid wireless industry who refused to agree to a license.  Cingular's and Ericsson's

16   understanding was far from idiosyncratic – it was shared by others, such as the trade

17   press, thereby demonstrating its reasonableness.

18          Rule 30(b)(6) depositions recently taken of Cingular and Ericsson by Freedom

19   Wireless, as authorized by the Court's Order dated February 23, 2007, confirm that in

20   August 2006 this dispute was concrete, real, and substantial, not abstract.  For

21   example, Mr. Berinhout testified on behalf of Cingular that "Mr. Pressman conveyed

22   to me that Freedom Wireless contended that Cingular's use of the Ericsson platform

23   violated its two patents . . . that unless Cingular obtained its own license, Cingular

24   would be exposed to Freedom's contentions that Cingular's use of the Ericsson

25   platform infringed its patents." Berinhout Dep., pp. 76-77. Mr. Berinhout further

26   testified that "Mr. Pressman conveyed to me that if Cingular did not secure such a

27   license, that Freedom Wireless would be suing Cingular and Ericsson with respect to

28   Cingular's use of the Ericsson platform and contend that use of the platform

13

infringed" Freedom Wireless' patents. *Id.,* p. 77.   Such an infringement lawsuit,
Mr. Pressman explained to Mr. Berinhout, would be brought at some point following
the conclusion of *Freedom Wireless I. Id.,* pp.77-78.

Similarly, Mr. Frank Vecella testified on behalf of Ericsson that Cingular was
"absolutely certain" that Freedom Wireless would sue Cingular and Ericsson for use
of the Ericsson platform after conclusion of the *Freedom Wireless I* case.  Vecella
Dep., at pp. 19-20 (attached as Exhibit F); *accord, e.g., id.* pp. 55-56, 95, 125-27..
"[I]t was inevitable that Freedom Wireless would then set its sights on Cingular and
Ericsson." *Id.,* p. 95.  As Mr. Vecella explained, Cingular and Ericsson believed
(correctly, as it turned out) that Freedom Wireless would sue them for the Ericsson
platform because, among other reasons, Freedom Wireless contended its patents
covered the Ericsson platform and advanced claim constructions that would ensnare
the Ericsson platform; it was clear that unless Ericsson "[brought its] checkbook" and
"participated" in the *Freedom Wireless I* settlement negotiations, the settlement would
be limited to the BCGI systems; and Freedom Wireless proposed a standstill
agreement for its infringement claim with respect to the Ericsson platform. *Id.,* pp.
94-95, 98-101, 126-28, and 135-37.  Simply put, it was "inevitable" that Ericsson and
Cingular would be the "next round," the "next wave of litigation" by Freedom
Wireless. *Id.,* p. 95.

Although neither Cingular nor Ericsson received it prior to filing the
Complaint, a letter Freedom Wireless produced during discovery clearly demonstrates
its intent to enforce its patents with respect to Cingular's use of the Ericsson platform.
In that correspondence, Freedom Wireless proposed a settlement of *Freedom Wireless
I* which would have required entry of a judgment that its patents were valid and
enforceable.  Freedom Wireless explained that it "is not prepared to give Cingular the
ability to have a chance to start from scratch on someone else's nickel" and that it
wanted to be "assured that it will not have to re-litigate issues other than infringement
with Cingular."  Exhibit G.

14

1    Finally, that a justiciable controversy existed as of August 2006 is further

2    confirmed by the fact that Freedom Wireless sued Cingular and Ericsson for patent

3    infringement in the Eastern District of Texas just one day before it filed its Motion to

4    Dismiss in this case.

5    **III.    There Is No Basis To Decline Jurisdiction.**

6    Before this Court may decline to exercise jurisdiction, there must be a well-

7    founded reason for doing so that is consistent with the purposes of the Declaratory

8    Judgment Act.  Absent such reasons, the declaratory judgment plaintiff is entitled to

9    seek relief in the forum it has chosen.  *Capo, Inc. v. Dioptics Med. Prods., Inc.*, 387

10   F.3d 1352, 1355 (Fed. Cir. 2004); *accord SanDisk*, 2007 WL 881008 at *10.

11   Freedom Wireless provides this Court with no such well-founded reason.  On the

12   contrary, each of its reasons directly conflict with the policies behind the Act and the

13   "first-to-file" rule.

14   First, relying entirely upon *EMC Corp. v. Norand Corp.*, 89 F.3d 807 (Fed.

15   Cir. 1996), Freedom Wireless argues that it can defeat jurisdiction in the District of

16   Arizona simply by filing a patent infringement action several months later in the

17   Eastern District of Texas.  But *EMC* held no such thing.  It actually said precisely the

18   opposite: "Nor can a district court dismiss a declaratory judgment action merely

19   because a parallel patent infringement suit was subsequently filed in another district;

20   to take such action without any other reasons . . . would be contrary to the general rule

21   favoring the forum of the first-filed action."  *Id.* at 813 (citing *Genentech, Inc. v. Eli

22   Lilly and Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993)).[4]  In *Genentech*, the Federal Circuit

23   specifically held that it would undermine the purposes of the Declaratory Judgment

24   Act, as well as the general rule favoring the forum of the first-filed action, to dismiss a

25   declaratory judgment action simply because the patentee subsequently files an

26   _____

27   [4]    The Federal Circuit upheld a discretionary dismissal in *EMC* only because the
     plaintiff attempted to use the declaratory judgment action to gain leverage in on-going

28   license negotiations with the patentee and "to undermine the value of the patent so as
     to impede its sale or licensing to a third party." 89 F.3d at 814.  As a result, *EMC* is
     wholly inapposite.

15

1    infringement action in another forum.  998 F.2d at 937-38.  Finally, in *SanDisk*, the

2    Federal Circuit held that a discretionary dismissal was improper, 2007 WL 881008 at

3    *10, even though the concurring opinion noted that the parties were "engaged in a

4    parallel infringement action in another district court."  *Id.* at *12 n. 2.

5         Simply put, the very purpose of the Declaratory Judgment Act is to enable a

6    person, finding himself enmeshed in a dispute over a patent, to obtain resolution of

7    the dispute instead of being forced to wait for the patent owner to decide when and

8    where to sue.  *See, e.g., EMC*, 89 F.3d at 811; *Genentech,* 998 F.2d at 937.  As a

9    result, it cannot be improper "forum shopping" for Cingular and Ericsson to employ

10   the Act for the very purposes for which it was enacted by filing a declaratory

11   judgment action in the District of Arizona several months before Freedom Wireless

12   filed its patent infringement action in the Eastern District of Texas.  Nor can it be

13   improper for Cingular and Ericsson to select as the forum the District of Arizona

14   where Freedom Wireless has its only place of business.[5]

15        Where, as here, a declaratory judgment action serves the objectives for which

16   the Declaratory Judgment Act was created, a discretionary dismissal "is rarely

17   proper."  *Capo,* 387 F.3d at 1355; *accord Genentech*, 998 F.2d at 937.  Indeed, the

18   Federal Circuit has explained that the only instances where a discretionary dismissal

19   might be proper are (1) when the declaratory judgment action was initiated for the

20   improper purpose of gaining leverage in license negotiations, (2) where the forum is

21   inconvenient to the patentee or important witnesses, or (3) where the forum lacks

22   personal jurisdiction over necessary parties.  *EMC*, 89 F.3d at 814-15; *Genentech*, 998

23   F.2d at 937-38.  None of these reasons apply in this case.  Since Freedom Wireless'

24   offices are located four city blocks from the Sandra Day O'Connor U.S. Courthouse,

25

26   _____

27   [5]    Since Freedom Wireless is a Nevada corporation, this District is one of the
     only two Districts known to Plaintiffs to possess personal jurisdiction over Freedom
28   Wireless.  As a result, by filing its infringement action in Texas after this declaratory
     judgment action was filed in Freedom Wireless' home in Phoenix, it is Freedom
     Wireless who is engaged in "forum shopping."

1    it can hardly argue that the District of Arizona is an inconvenient forum for this

2    litigation.

3         Second, Freedom Wireless is boldly asking this Court to defer to a

4    subsequently filed infringement action in direct contravention of the first-to-file rule.

5    "The general rule favors the forum of the first-filed action, whether or not it is a

6    declaratory action." *Genentech*, 998 F.2d at 937.  Rather than defer to the forum of

7    the later-filed action, the Supreme Court has instructed that the forum of the first-filed

8    action should ordinarily enjoin the later filed action pending determination of the

9    declaratory judgment suit.  *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S.

10   180, 184-85 (1952).  In order to depart from this rule, the trial court must first

11   conclude that it would be unjust or inefficient to allow the first-filed action to

12   proceed.

13        Freedom Wireless fails woefully to make such a showing.  Freedom Wireless'

14   "center of gravity" argument is to no avail, as it relies upon Freedom Wireless'

15   decision to violate the first-to-file rule by suing Cingular and Ericsson in the Eastern

16   District of Texas.[6]  Second, unlike Freedom Wireless, Cingular and Ericsson are

17   confident that this Court is just as capable to handle a patent infringement lawsuit as

18   is Judge Ward of the Eastern District of Texas.  Although the District of Arizona does

19   not have specific rules governing patent infringement cases, this Court is perfectly

20   capable of fashioning specific procedures and provisions in a case management order

21   to take care of the particular needs of this patent case.  If there are any procedures in

22   the Eastern District of Texas patent rules that Freedom Wireless wants to propose for

23   adoption in this case, it is perfectly free to do so.

24   _____

25   [6]     Moreover, it is hardly a certainty that the Eastern District of Texas will allow
     that litigation to proceed, as Freedom Wireless appears to believe.  Cingular and
26   Ericsson have moved to transfer the Texas case to the District of Arizona, as have the
     defendants in the companion litigation.  Transfer is likely, as Judge Ward has recently
27   invoked the first-to-file rule to transfer three cases involving essentially identical facts
     as the instant case. *02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 2006 WL
28   887391 (E.D. Tex. 2006); *National Instr. Corp. v. Softwire Tech., LLC*, No. 2:03-CV-
     047 (E.D. Tex. 2003); *Charles E. Hill & Assocs., Inc. v. Amazon.com, Inc.*, No. 2:02-
     CV-186 (E.D. Tex. 2003).

1        DATED this 13th day of April, 2007.

2                                          OSBORN MALEDON, P.A.

3                                     By   _Brett L. Dunkelman_____
4                                          William J. Maledon
                                           Brett L. Dunkelman
5                                          2929 North Central Avenue, 21st Floor
                                           Phoenix, Arizona  85012-2793
6
                                           Larry D. Carlson
7                                          Barton E. Showalter
                                           James W. Bristow
8                                          Baker Botts LLP
                                           2001 Ross Avenue, Suite 600
9                                          Dallas, TX  75201-2980

10                                         Attorneys for Ericsson Inc. and Cingular
                                           Wireless LLC
11

12   COPY of the foregoing E-Mailed and
     delivered via U.S. Mail this 13th day of April, 2007,
13   to:

14   Mark Deatherage
     Gallagher & Kennedy, P.A.
15   2575 East Camelback Road
     Phoenix, AZ  85016-9225
16   mmd@gknet.com

17   Paul F. Ware, P.C.
     p.ware@goodwinprocter.com
18   John Kenneth Felter
     Kfelter@goodwinprocter.com
19   Elaine Herrmann Blais
     eblais@goodwinprocter.com
20   Goodwin Procter LLP
     Exchange Place
21   Boston, MA  02109-2881

22   _Suzanne Wiedemeyer_

23

24   1589076

25

26

27

28

18

**A**

OSBORN
MALEDON
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW

The Phoenix Plaza
21st Floor
2929 North Central Avenue
Phoenix, Arizona 85012-2793

P.O. Box 36379
Phoenix, Arizona 85067-6379

Telephone        602 640 9000
Facsimile        602 640 9050

1  William J. Maledon, 003670
2  Brett L. Dunkelman, 006740
   OSBORN MALEDON, P.A.
3  2929 North Central Avenue
   21st Floor
4  Phoenix, Arizona  85012-2793
   (602) 640-9000
5  E-mail: wmaledon@omlaw.com
6  E-mail: bdunkelman@omlaw.com

7  Larry D. Carlson, (admitted *pro hac vice*)
8  Barton E. Showalter, (admitted *pro hac vice*)
   Christopher W. Kennerly (admitted *pro hac vice*)
9  James W. Bristow, (admitted *pro hac vice*)
   Russell J. Crain, (admitted *pro hac vice*)
10 Baker Botts LLP
11 2001 Ross Avenue, Suite 600
   Dallas, TX  75201-2980
12 (214) 953-6500

13

14 Attorneys for Ericsson Inc. and Cingular Wireless LLC

15           IN THE UNITED STATES DISTRICT COURT

16             FOR THE DISTRICT OF ARIZONA

17 Ericsson Inc. and Cingular Wireless LLC,    )  No. CV06-1935 PHX JAT
18                              Plaintiffs,    )
19                                             )  **DECLARATION OF**
   vs.                                         )  **NEAL S. BERINHOUT**
20                                             )
   Freedom Wireless, Inc.,                     )
21                                             )
                          Defendant.           )
22 _____   )

23        I, Neal S. Berinhout, declare:

24        1.    I am over the age of twenty-one years.  My testimony herein is

25 based upon my own personal knowledge or upon information I learned in the course

26 of performing my responsibilities as in-house counsel for Cingular Wireless LLC

27 ("Cingular").  The facts set forth in this Declaration are true and correct.

28

2.      I am a lawyer. I have been practicing law for twenty years. For the past six years I have been an Associate General Counsel in charge of litigation for Cingular and have officed at 5565 Glenridge Connector, Suite 1700, Atlanta, Georgia 30342.

3.      Cingular is a wireless carrier, a telephone company that provides services for mobile phone subscribers. One component of Cingular's business is prepaid wireless, sometimes called pay as you go, which allows a subscriber to pay in advance and receive services as long as there is a positive balance in the subscriber's account. Companies such as Boston Communications Group, Inc. ("BCGI") and Ericsson Inc. ("Ericsson") provide platforms or systems that the switches in Cingular's network access in connection with telephone calls to and from its subscribers. These platforms or systems handle accounting functions and instruct the switches in Cingular's network about how to handle the calls. A wireless communications protocol describes how the voice and other data associated with the calls is communicated and how various network components are configured. Historically, Cingular's network used a Time Division Multiple Access, referred to as TDMA, communications protocol and relied on a platform or system provided by BCGI that functioned only with TDMA networks. In 2001, Cingular began using a more advanced Global System for Mobile Communications, referred to as GSM, communications protocol that allowed it to more easily provide advanced features to its subscribers. The GSM network relies on a new platform or system provided by Ericsson that was specially designed for GSM networks and, unlike the older BCGI platform or system, does not function with TDMA networks.

1    4.    I was Cingular's in-house lawyer with principal day to day

2   responsibility for litigation captioned *Freedom Wireless, Inc. v. Boston*

3
    *Communications Group, Inc., et al.*, No. CV-00-12234-EFH (D. Mass.) ("the Boston
4
5   Action"). Defendants in the Boston Action included Boston Communications Group,

6   Inc. ("BCGI") and several wireless carriers, including Cingular, who used systems

7
    provided by BCGI to offer pre-paid wireless phone services. In the Boston Action,
8
9   Freedom Wireless, Inc. ("Freedom Wireless") claimed that Cingular and the other

10  wireless carriers infringed U.S. Patents 5,722,067 and 6,157,823 (the "'067 and '823

11  Patents"). This case was tried to a jury. I attended the trial. On May 20, 2005, the

12
    jury rendered its verdict in favor of Freedom Wireless and awarded damages of about
13
14  $128 million.

15    5.    Although the Boston Action focused on pre-paid wireless

16  services offered by Cingular that made use of systems provided by BCGI, it was clear

17
    to me from statements made and positions advanced by Freedom Wireless before and
18
19  during trial, that Freedom Wireless's allegations of infringement were not limited to

20  the Cingular services that made use of BCGI systems. Cingular had begun offering

21  pre-paid wireless services that made use of systems provided by Ericsson, and

22
    Freedom Wireless made it clear that its claims of infringement with respect to the
23
24  '067 and '823 Patents, particularly its allegations as to the scope of these patents,

25  were broad enough to include the Cingular services based on Ericsson systems.

26    6.    During trial of the Boston Action, I had several discussions with

27  Robert Pressman, one of the lawyers representing Freedom Wireless, concerning

28  possible settlement of BCGI's claims against Cingular. I believe that by this time,

Freedom Wireless was aware that Cingular had begun to offer pre-paid wireless services using systems provided by Ericsson.  In connection with my settlement discussions with Mr. Pressman during trial of the Boston Action in 2005, one scenario I discussed with him was the possibility of Cingular getting a complete release for past activities and a full license under the '067 and '823 Patents for future activities. In the context of these discussions, I told Mr. Pressman that Cingular believed that Ericsson owed it indemnity with respect to Cingular pre-paid wireless services based on the Ericsson systems, and that a Cingular settlement that extended beyond the BCGI systems would have to involve Ericsson.

7.      During trial of the Boston Action, I kept Ericsson in-house counsel John Han and Frank Vecella advised of the status of the trial and of my settlement discussions with Mr. Pressman.  I had discussions with Ericsson concerning whether Ericsson owed Cingular indemnity for any Freedom Wireless claim that targeted Cingular services that use an Ericsson system.  I discussed with Ericsson the possibility of Ericsson participating in mediation with Freedom Wireless and Cingular.  Ericsson declined to participate in mediation with Freedom Wireless.  I then told Mr. Pressman that absent Ericsson's participation in the settlement discussions, settlement would have to be limited to the BCGI systems.  I advised Ericsson that if a settlement with Freedom Wireless was limited to the BCGI systems, then Freedom Wireless litigation against Cingular based on the Ericsson systems was certain to be the next round of litigation.

8.      Following the May 20, 2005, jury verdict in favor of Freedom Wireless in the Boston Action, I saw that Freedom Wireless issued a press release

saying that "'[t]his verdict sends a message to these defendants and any others who have been infringing these patents that Freedom Wireless will pursue its rights to the fullest.'"  This press release reinforced my belief that Freedom Wireless would eventually sue Cingular for its use of the Ericsson systems.

9.     In the first half of 2006, my efforts in connection with the Boston Action focused on various activities involved in the appeal to the Court of Appeals for the Federal Circuit, including the preparation of an appellate brief.  During this time, I learned that BCGI had employed David Kiernan, Williams & Connolly LLP, to represent it in connection with settlement negotiations with BCGI.  On May 19, 2006, Mr. Kiernan told me that BCGI had reached a global settlement with Freedom Wireless, but that the settlement concerned only BCGI's systems and would not protect Cingular with respect to pre-paid services from providers other than BCGI. Mr. Kiernan advised me that Cingular might have to deal with Freedom Wireless claims against Cingular based on systems unrelated to BCGI and that Freedom Wireless had proposed a standstill agreement with respect to such claims.  The press issued by BCGI when the settlement was finalized, authorized by Freedom Wireless, emphasized that the settlement "does not resolve or settle any claims, disputes or liabilities relating to the use or infringement of the Freedom patents by mobile operators in connection with any pre-paid wireless system or service other than the services provided by BCGI."

10.     In June 2006, I obtained from Mr. Kiernan a copy of the standstill agreement proposed by Freedom Wireless with respect to future

1    infringement claims against Cingular relating to its use of systems other than BCGI's.

2    Here is the agreement that Freedom Wireless proposed:

3
4            Cingular Standstill and Negotiation Period.

5            a) During the period commencing on the Effective Date
             and ending on December 31, 2006 (the "Standstill
6            Period"), Cingular and Freedom will negotiate in good
             faith to resolve claims or disputes that Freedom may have
7            that pre-paid wireless systems used in the past or future by
             Cingular, other than the BCGI Prepaid Wireless System,
8            do or may infringe the Freedom Patents.  During the
9            Standstill Period, Freedom will not initiate any litigation
             claiming infringement by Cingular of any Freedom
10           Patents and, in consideration of that forbearance, Cingular
             shall not challenge the Freedom Patents pursuant to
11           paragraph 11(b) directly or through or in conjunction with
12           any third party. b) As between Freedom and Cingular, all
             applicable statutes of limitations and periods giving rise to
13           any alleged estoppel or laches are hereby be tolled during
             the Standstill Period.  c) All communications between
14           Freedom and Cingular pursuant to this paragraph 10 shall
15           be confidential, subject to Rule 408 of the Federal Rules
             of Civil Procedure, and inadmissible for any purposes,
16           including impeachment, in any subsequent litigation
17           between Freedom and Cingular.  d) If Freedom and
             Cingular are unable to resolve all outstanding disputes by
18           the end of the Standstill Period, unless otherwise agreed
19           by Freedom and Cingular, all subsequent disputes
             between Freedom and Cingular shall be resolved by an
20           action filed with the United States District Court for the
             District of Massachusetts and Freedom and Cingular each
21           submit to the jurisdiction of that Court for the limited
22           purpose of resolving such disputes.

23   From the language of this standstill agreement proposed by Freedom Wireless, I

24   understood that Freedom Wireless contended that Cingular pre-paid wireless services

25   based on Ericsson systems infringed the Freedom Wireless patents, that Freedom

26
     Wireless intended to assert an infringement claim against Cingular for the Ericsson
27
28   systems, and that Freedom Wireless wanted to ensure that venue of that infringement

1   claim would be in the Boston district court.  I asked Mr. Kiernan to tell Freedom

2   Wireless that Cingular was not interested in such a standstill agreement.

3           11.     While I firmly believed, based on the statements made by

4   Freedom Wireless, that it intended to sue Cingular for its pre-paid wireless services

5   that use the Ericsson systems, I did not believe that Freedom Wireless would file that

6   action until after the Boston Action was finally resolved.  Freedom Wireless's

7   proposal of a standstill agreement reinforced that belief.

8

9           12.     I understood that my discussions with Robert Pressman in 2005,

10  and David Kiernan's discussions with him in 2006, were settlement discussions

11  within the meaning of Federal Rule of Evidence 408 and, as such, would not be

12  admissible to prove liability for or invalidity of a claim or the amount of a claim.  I do

13  not believe, however, that Cingular ever agreed with Freedom Wireless that such

14  discussions would not be admissible or could not be used for any purpose, and I am

15  not aware of any such agreement between BCGI and Freedom Wireless.

16          13.     On August 8, 2006, Ericsson and Cingular filed this declaratory

17  judgment action against Freedom Wireless.  Ericsson and Cingular delayed serving

18  Freedom Wireless until after settlement of the Boston Action was consummated,

19  which required the entry of stipulated orders by both the Federal Court and the

20  District of Massachusetts.  While I thought it was unlikely that service of the

21  declaratory judgment action on Freedom Wireless would disrupt the consummation of

22  the settlement of the Boston Action, I did not want to take any chance in that regard.

1

2       Pursuant to 28 U.S.C. § 1746, I further declare under penalty of perjury that the

3    foregoing is true and correct.

4

5    Dated:  4-9-07                            N.S.Blt

6                                              Neal S. Berinhout

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B**

OSBORN
MALEDON
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW

The Phoenix Plaza
21st Floor
2929 North Central Avenue
Phoenix, Arizona 85012-2793

P.O. Box 36379
Phoenix, Arizona 85067-6379

Telephone      602.640.9000
Facsimile      602.640.9050

1  William J. Maledon, 003670
2  Brett L. Dunkelman, 006740
   OSBORN MALEDON, P.A.
3  2929 North Central Avenue
   21st Floor
4  Phoenix, Arizona  85012-2793
   (602) 640-9000
5  E-mail:  wmaledon@omlaw.com
6  E-mail:  bdunkelman@omlaw.com

7  Larry D. Carlson, (admitted *pro hac vice*)
8  Barton E. Showalter, (admitted *pro hac vice*)
   Christopher W. Kennerly (admitted *pro hac vice*)
9  James W. Bristow, (admitted *pro hac vice*)
10 Russell J. Crain, (admitted *pro hac vice*)
   Baker Botts LLP
11 2001 Ross Avenue, Suite 600
   Dallas, TX  75201-2980
12 (214) 953-6500

13

14 Attorneys for Ericsson Inc. and Cingular Wireless LLC

15

16            IN THE UNITED STATES DISTRICT COURT

17            FOR THE DISTRICT OF ARIZONA

18 Ericsson Inc. and Cingular Wireless LLC,  )  No. CV06-1935 PHX JAT
                                             )
19            Plaintiffs,                     )
                                             )  **DECLARATION OF**
20 vs.                                        )  **JOHN HAN**
                                             )
21 Freedom Wireless, Inc.,                    )
                                             )
22            Defendant.                      )
                                             )

23        I, John Han, declare:

24        1.      I am over the age of twenty-one years.  My testimony herein is

25 based on my own personal knowledge or upon information I learned in the course of

26 performing my responsibilities as counsel for Ericsson Inc.  The facts set forth in this

27 Declaration are true and correct.

28

2.      I am a lawyer, in-house counsel for Ericsson AB.  My title is Vice President of Patent Development, Licensing & Patent Development.  Since the first week of August 2006, I have officed in Stockholm, Sweden.  Before the first week of August 2006, I served as Associate General Counsel-IPR for Ericsson Inc. ("Ericsson").  During that time, I officed at Ericsson's offices in Plano, Texas.

3.      In early April or late March 2005, Cingular Wireless LLC ("Cingular"), which was then in a jury trial as a defendant in litigation captioned *Freedom Wireless, Inc. v. Boston Communications Group, Inc., et al.*, No. CV-00-12234-EFH (D. Mass.) (the "Boston Action"), contacted Ericsson to discuss that case. Later in April 2005, I had discussions with Cingular in-house counsel, Neal Berinhout, concerning the Boston Action.  I understood that the focus of the Boston Action was BCGI systems used by Cingular and the other pre-paid wireless carrier defendants in the case to provide pre-paid wireless telephone services.  Mr. Berinhout, however, told me that Freedom Wireless also contended that its patents were sufficiently broad in scope that they would cover Cingular pre-paid wireless services that used non-BCGI systems.  Although invited to do so, Ericsson declined to join in settlement discussions with Freedom Wireless.

4.      In May 2005, Frank Vecella, Ericsson's Associate General Counsel - Litigation, and I had discussions with Cingular, primarily with Mr. Berinhout, concerning whether Ericsson owed Cingular indemnity with respect to a Freedom Wireless infringement claim against Cingular for pre-paid wireless services based on Ericsson systems.

5.       In the summer of 2005, Mr. Vecella and I believed that while Freedom Wireless would eventually sue Cingular and Ericsson for Cingular's use of Ericsson's systems, it would probably not do so until after the Boston Action had been finally concluded.  Freedom Wireless had recently sued Nextel and Alltel for using BCGI equipment in the United States District Court for the District of Massachusetts.  As compared to the suits against Nextel and Alltel, an infringement action against Ericsson and Cingular would be a major piece of litigation.  It appeared that Freedom Wireless wanted to sue smaller companies first and defer suing larger companies until after the Boston Action was concluded.

6.       On May 20, 2005, the jury in Boston rendered its verdict in favor of Freedom Wireless and awarded it damages of approximately $128 million.  The following month, on June 28, I saw an article published in Wireless Weekly Magazine titled "BCGI's Trouble: Signal for Others?"  That article stated that the Freedom Wireless suit in Boston "could trouble other vendors as well. . . . [T]he industry should be fearful because this judgment covers such a broad description of prepaid."  The article noted that "Ericsson also makes a pre-paid solution" and mentioned that Cingular was "in the process of moving its TDMA subscribers to GSM."  Cingular used BCGI for its TDMA networks, but used Ericsson for its GSM networks.  This article reinforced my belief that when the Boston Action was resolved, Freedom Wireless would sue Cingular and Ericsson for the Ericsson systems.

7.       On November 3, 2005, I received an article by the Yankee Group that discussed Freedom Wireless and the Boston Action.  The article stated that Freedom Wireless "has already filed suit against Nextel and Alltel, and the May 2005

decision could lead to action against other vendors and service providers, including Ericsson . . .." This article further reinforced my belief that Freedom Wireless would file an action claiming infringement based on the Ericsson systems once the Boston Action was finally concluded.

8.     In the May to June 2006 time period, I learned that BCGI had reached a global settlement with Freedom Wireless, that the settlement was limited to BCGI systems, and that Freedom Wireless was proposing a standstill agreement with Cingular concerning the Ericsson systems.  These facts even further reinforced my belief that Freedom Wireless intended to assert an infringement claim with respect to the Ericsson systems once the Boston Action was finally concluded.

9.     I am not aware of any agreement with Freedom Wireless that settlement discussions would be inadmissible and could not be used for any purpose, beyond the limitations provided by Fed.R.Evid. 408.  I do not believe that Ericsson ever entered into any such agreement.

Pursuant to 28 U.S.C. § 1746, I further declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   4-05-07

John Han

C

1

1          UNITED STATES DISTRICT COURT

2          DISTRICT OF MASSACHUSETTS

3              No. 1:00-cv-12234-EFH
               Vol I, Pages 1 - 86
4

5
   FREEDOM WIRELESS, INC.,
6              Plaintiff

7   vs.

8
   BOSTON COMMUNICATIONS GROUP, INC., et al
9              Defendants

10

11                  *********
12

13
                 For Trial Before:
14           Honorable Edward F. Harrington

15

16
              United States District Court
17           District of Massachusetts (Boston.)
              One Courthouse Way
18           Boston, Massachusetts 02210
              Monday, March 28, 2005 (Day XVIII)
19

20                  ********
21

22       REPORTER: RICHARD H. ROMANOW, RPR
             Official Court Reporter
23           United States District Court
      One Courthouse Way, Room 3507, Boston, MA 02210
24              (617) 737-0370

25

1    letter and particularly to the second paragraph of that

2    letter.  In that letter you state that you're "Prepared to

3    offer licenses to the recipient on reasonable terms and

4    conditions."  Correct?

5    A.  Correct.

6    Q.  And then you say you have no interest in further

7    litigation.  Correct?

8    A.  That's correct.

9    Q.  And you say that "Many people would prefer to wait for the

10   outcome of this lawsuit before making any determination as to

11   the need for a license."  Correct?

12   A.  Yes.

13   Q.  And you say to them, "But you're optimistic about the

14   upcoming trial and the preferential terms that we are currently

15   preparing to offer will no longer be available if and when

16   Freedom Wireless prevails against Boston Communications."  Do

17   you see that?

18   A.  Yes.

19   Q.  Isn't it a fact, Mr. Day, that if one of these companies,

20   such as Endless Wireless, refuses to enter into a license with

21   you now or doesn't enter into a license with you at the

22   conclusion of this case, that, in fact, you will sue them?

23   A.  Isn't it what?

24   Q.  Isn't it a fact, isn't that your plan, that once this case

25   is over, that if they haven't entered into a license with you

1     and if you were to prevail in this case and they don't enter

2     into a license, then isn't your business strategy at Freedom

3     Wireless that you'll sue them?

4     A.   Our business strategy or plan at Freedom Wireless remains

5     as it was when it was founded.  And that is that we license

6     those that want a license.  And if we have to enforce it, we

7     will enforce it.

8     Q.   And that will be by a lawsuit?

9     A.   Correct.

10              MR. KEATING:  That's all I have.

11              THE COURT:  All right.  We'll take a 20 minute

12    morning break.

13              (Recess, 11:00 a.m.)

14

15                 C E R T I F I C A T E

16

17

         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do
18    hereby certify that the foregoing record is a true and
      accurate transcription of my stenographic notes on
19    Monday, March 28, 2005 before Honorable Edward F.
      Harrington, to the best of my skill and ability.

20

21

22

23          _____
                RICHARD H. ROMANOW
24
                      25

**D**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Cingular Wireless LLC and )   No. CVO6-1935 PHX JAT
Ericsson Inc.,             )
                          )
        Plaintiffs,        )
                          )
     vs.                   )
                          )
Freedom Wireless, Inc.,    )
                          )
        Defendant.         )
_____)

RULE 30(b)(6) EXAMINATION OF ERICSSON INC.

NEAL S. BERINHOUT

(Contains Confidential Information)

March 22, 2007
8:42 a.m.
Phoenix, Arizona



Glennie
Reporting Services

5333 North 7th Street
Suite B110
Phoenix, Arizona 85014-2840

(602) 266-6535 Phone
(602) 266-9661 Fax

Prepared by:
Marianne S. Burton, RPR
Arizona Certified
Reporter No. 50519

Prepared for:
Brett L. Dunkelman
Attorney at Law

(Copy)

Cingular Wireless LLC and Erickson Inc. vs. Freedom Wireless, Inc.
30(b)(6) Freedom Wirelss (Neal S. Berinhout) - 3/22/07

Page 58

1    A.   I'm not certain.
2    Q.   Was it you?
3    A.   It's possible it was me. I don't remember.
4    Q.   You have no memory one way or the other who
5    drafted that?
6    A.   This was clearly collaborative.  I mean -- I
7    don't have -- I don't know whether it was me or someone
8    else.  It was certainly based upon information -- if it
9    was drafted by outside counsel, it was based upon
10   information I provided to outside counsel.
11   Q.   The beginning of this sentence, says "Although
12   the Boston Action focused on pre-paid wireless services
13   offered by Cingular that made use of systems provided by
14   BCGI..."
15        What, if any, other systems were at issue in
16   the Boston action?  To be clear, I'm going to use the
17   word Freedom Wireless I, so I'm at least consistent.
18   What other systems, if any, were at issue in
19   Freedom Wireless I?
20   A.   Well, I'd have to answer that by dividing --
21   I'd have to divide my answer into parts.
22        The complaint that was filed -- and I
23   believe there was at least one amended complaint --
24   alleged that Cingular was violating BCG -- I'm sorry --
25   violating Freedom's patents generally, not just with

Page 59

1    respect to our use of the Boston Communications system.
2         And the positions -- Freedom took the
3    position, I believe, rather consistently in the
4    litigation, that its patents were broad enough to cover,
5    from Freedom's perspective, any network-based, as opposed
6    to a handset-based, prepaid system that did not require
7    the use of an access code or a PIN code.
8         So based upon Freedom's contentions in the
9    litigation, our use of the Ericsson platform would be
10   infringing.
11        Freedom took that -- Freedom took this broad
12   position with respect to its patents again in its
13   complaint, in various discovery documents, as I recall.
14   I believe took that position in its Markman's pleadings.
15   I don't think it ever took a contrary position.
16        At some point in the litigation, however,
17   fairly early in the process, certainly well before trial,
18   an understanding developed, and I don't remember offhand
19   whether this was ever reduced to writing, but an
20   understanding developed that that case and the trial
21   would focus on the BCGI system and BCGI's carrier
22   customers' use of that system.  And as a result of that
23   understanding or agreement, we -- Cingular -- and I
24   believe this is true with the other carrier defendants as
25   well -- restricted our discovery responses to documents

Page 60

1    that were relevant to our use of the BCGI system.  It's
2    possible we produced documents early on that may have
3    gone beyond that.  I don't remember.  It certainly was
4    clear, I think, to all the parties and to
5    Judge Harrington, that the trial would focus on the BCGI
6    system, and the trial did, in fact, focus on the BCGI
7    system.
8    Q.   At the trial, was there any evidence introduced
9    concerning other systems other than the BCGI system?
10   A.   Well, yes in that once again, Freedom's
11   contention was that its patents covered systems that
12   would have included Ericsson and other platforms.
13   Freedom conceded that TracFone, which is a very popular
14   prepaid system which uses a handset-based prepaid system
15   rather than a network-based prepaid system, did not
16   infringe its patents, but any network-based system
17   Freedom contended did infringe.
18        So all the evidence that Freedom introduced,
19   either through its own witnesses and documents or through
20   defendants' witnesses and documents, relating to
21   Freedom's contentions with respect to its patents would
22   be, to one extent or another, relevant to its contentions
23   with respect to other systems.
24        That doesn't mean that -- there was no
25   concession on the part of Cingular or any other defendant

Page 61

1    that they were right about that, but that certainly was
2    their contention.
3    Q.   Was Ericsson a defendant in Freedom Wireless I?
4    A.   No.
5    Q.   Was any evidence introduced at Freedom
6    Wireless I concerning the Ericsson system?
7    A.   I just answered that question.  There was no
8    evidence introduced, that I recall, that specifically
9    named the Ericsson system.  But, for example, in this
10   pending case in Phoenix, I will be rather shocked if
11   Freedom Wireless does not introduce, or at least attempt
12   to introduce a bunch of the same evidence regarding its
13   patents with respect to Cingular's use of the Ericsson
14   system that it introduced in the Boston trial.
15        (Mark M. Deatherage, Esq., joined the
16        proceedings.)
17   Q.   BY MR. FELTER:  I'm only talking about
18   Freedom Wireless I.
19        Is it your contention that there was
20   evidence introduced at either the jury trial or the bench
21   trial regarding the Ericsson system or platform?
22   A.   Again, I think I answered that.  I do not
23   recall any evidence introduced that named the Ericsson
24   system or that described the Ericsson system that
25   purported to distinguish between the Ericsson system and

16 (Pages 58 to 61)

Cingular Wireless LLC and Erickson Inc. vs. Freedom Wireless, Inc.
30(b)(6) Freedom Wirelss (Neal S. Berinhout) - 3/22/07

Page 62

1  the BCGI system.  But there was evidence introduced at
2  Freedom I regarding Freedom's contentions about the scope
3  of its patents that would, if Freedom were correct about
4  the scope of its patents, would arguably involve the
5  Ericsson system.
6        Again, that's without conceding that Freedom
7  is correct.
8    Q.   Now, focusing on this paragraph No. 5, the
9  sentence I just read, you break it down between
10  statements made and positions advanced by
11  Freedom Wireless before and during the trial.
12    A.   Yes.
13    Q.   Focusing for the moment just on statements
14  allegedly made before the trial.  So before the trial,
15  what statements did Freedom Wireless make before the
16  trial that you're referring to here?
17    A.   Well, Freedom made numerous statements in the
18  litigation about the -- about its contention that its
19  patents were very broad and covered systems that Freedom
20  would contend include the Ericsson platform.  I don't
21  recall Freedom referencing the Ericsson platform in those
22  statements, but made -- made those statements.
23        In addition, in connection with various
24  settlement discussions, there were statements made before
25  trial, as well as during trial, in which Freedom counsel

Page 63

1  conveyed their intent to either reach a settlement with
2  Cingular that would involve Cingular obtaining a license
3  separate and apart from Cingular's use of the BCGI
4  system, and that would, therefore, cover Cingular's use
5  of the Ericsson platform, or, alternatively, Freedom
6  would proceed in litigation against Cingular's use of the
7  Ericsson system.
8    Q.   Okay.  Anything else regarding statements
9  allegedly made before trial?
10    A.   I think that covers it.
11    Q.   So if I heard your testimony correctly, just
12  focusing on before trial now, you said that
13  Freedom Wireless made very broad statements about the
14  scope of its patents.
15        Is that what -- one of the things you're
16  relying on here?
17    A.   Yes.
18    Q.   But didn't you also say that -- well, I'll ask
19  you directly:  Did Freedom Wireless ever say that it
20  thought the Ericsson system was covered by its patents?
21  This is before trial now.  I just want to focus on before
22  trial.
23    A.   I don't recall Freedom specifically stating
24  that it contended its patents covered the Ericsson system
25  in any pleadings in the litigation.  I'm confident,

Page 64

1  however, that in statements made in settlement
2  discussions, Freedom counsel conveyed that.
3    Q.   We'll get to that.
4        So the second thing you said is, during
5  settlement discussions.  That was the second thing you
6  mentioned.
7    A.   Correct.
8    Q.   So is it your testimony that during settlement
9  discussions, somebody from Freedom Wireless stated that
10  the Freedom Wireless patents covered the Ericsson system?
11    A.   Yes.  I mean, I don't remember the precise
12  dialogue, but we had settlement discussions with Cing- --
13  Cingular had settlement discussions with Freedom counsel,
14  and some of those discussions involved the proposal that
15  Cingular take a license that would cover Cingular's use
16  of any prepaid platform, including the Ericsson platform,
17  that Freedom would contend violates its patents and, in
18  that context, conveyed -- Freedom's counsel conveyed
19  their belief that these -- that Cingular's use of the
20  Ericsson platform also violated their patents.
21    Q.   Let me just try to ask the question very
22  precisely.
23        Did Freedom Wireless counsel ever state to
24  you or -- strike "to you" -- did they ever state
25  explicitly that they thought the Freedom Wireless patents

Page 65

1  covered the Ericsson system?
2    A.   Yes.
3    Q.   Who said that?
4    A.   Well, once again, I don't remember the precise
5  statements made, but they certainly conveyed that view.
6  The person I talked to most regarding settlement was
7  Mr. Pressman.  I know we had a -- at least a year, maybe
8  more than a year before the trial, we had a mediation in
9  California between Cingular and Freedom.  And I don't
10  remember many of the particulars of that mediation, but
11  it's entirely possible that in the course of that
12  discussion, we would have specifically discussed
13  Ericsson.  I'm not certain.  My best recollection about
14  those discussions are the discussions I had with
15  Mr. Pressman during the trial.
16    Q.   Okay.  Again, I just want to focus on before
17  trial, and I also want to draw a distinction because you
18  used the word "conveyed."
19        You testified that there were settlement
20  discussions about a license that would cover the Ericsson
21  system.  Is that correct?
22    A.   Essentially, yes.
23    Q.   I'm not -- I'm asking a separate question, a
24  very precise question:  Did anybody representing Freedom
25  Wireless say -- state that the Freedom Wireless patents

17 (Pages 62 to 65)

Cingular Wireless LLC and Erickson Inc. vs. Freedom Wireless, Inc.
30(b)(6) Freedom Wirelss (Neal S. Berinhout) - 3/22/07

Page 66

1  covered the Ericsson system?
2      A.   Well, I cannot testify precisely what was said
3  by Mr. Pressman or someone else representing Freedom and
4  someone representing Cingular with respect to that.  I
5  don't remember the precise dialogue.
6          What I do remember is that we had a
7  discussion about Freedom's contention that Cingular's
8  exposure exceeded its use of the BCGI patent -- BCGI
9  system.
10         If Freedom had believed that the only
11  Cingular system that infringed its patents was the BCGI
12  system, then we would have simply discussed the -- a
13  resolution of the litigation that would involve our
14  release of any claims with respect to Cingular's use of
15  the BCGI system.  But we were also discussing something
16  broader than that, and that was a release, via a license
17  or perhaps some other vehicle, that would cover
18  Cingular's use of any other system.
19         And at that point in time, that is, before
20  the months leading up to trial and certainly during the
21  trial, we had -- we had already begun shifting customers,
22  most of our customers, from the BCGI TDMA platform to the
23  Ericsson GSM platform.  And so the discussion focused not
24  only on Cingular's use of the BCGI but also Cingular's
25  use of the Ericsson system.

Page 67

1          And I purposefully used the word "convey,"
2  that is, the Freedom lawyers conveyed their view that the
3  Ericsson -- Cingular's use of the Ericsson platform
4  infringed their patents because I don't recall the
5  precise dialogue.  But there's absolutely no question
6  that we discussed that subject before trial and during
7  trial.
8      Q.   Okay.  So I just want to understand so I can
9  draw a distinction here.
10         You kept using the word "conveyed."
11         Is what you're saying that because the scope
12  of the settlement discussions were broader than the BCGI
13  system, you interpreted what Freedom Wireless was saying
14  is that the patents also covered the Ericsson system?
15      A.   No.
16      Q.   That's not what you're saying?
17      A.   No.  I'm saying that the Freedom -- we used --
18  we -- the word "Ericsson" was mentioned in our dialogue.
19  We didn't simply -- we didn't just talk theoretically.
20  We used -- we made references to Cingular's use of the
21  Ericsson system.  I used the word "conveyed" because I
22  cannot testify about the precise language, the precise
23  statement, precise words used by Mr. Pressman or someone
24  else on behalf of Freedom.  I believe it was Mr. Pressman
25  and me or someone else on behalf of Cingular.  I

Page 68

1  remember -- I remember the conversation.  I remember the
2  subject of the conversation -- or conversations, plural.
3  That's why I use the word "convey."
4      Q.   Did you ever hear -- now, let me back off to
5  during trial.  For a minute there, I was focusing on
6  before trial.
7      A.   Right.
8      Q.   Other than what you've already -- well, let me
9  back up.
10         What statements were made during the trial?
11  We're talking about statements now.  What statements were
12  made during the trial that led you -- go ahead.
13      A.   I'm sorry.  Did you finish your question?
14      Q.   I was just going to read that in context for
15  you.  I'm relying on your declaration paragraph 5.  You
16  said, "...statements made and positions advanced by
17  Freedom Wireless before and during trial..." -- were
18  not -- "...that Freedom Wireless's allegations of
19  infringement were not limited to the Cingular services
20  that made use of the BCGI system."
21         First of all, have I exhausted your
22  testimony regarding statements made before trial?
23      A.   I don't know whether you have or not.  It
24  depends on whether you have any other questions.
25      Q.   I'm asking you, is there any other statements

Page 69

1  that you allege were made before trial by
2  Freedom Wireless that led you to --
3      A.   Well, I believe I covered my recollection of
4  those statements and what was conveyed in those
5  discussions that we had before trial.
6      Q.   Now, was there anything different or in
7  addition during trial?
8      A.   During trial, we continued to have similar
9  conversations.  We also had conversations regarding a
10  settlement that would be limited to the BCGI case.
11  Throughout the trial, Judge Harrington urged the parties,
12  during frequent sidebars as well as -- well, I think
13  principally in communication he had with the lawyers
14  following each trial session, Judge Harrington frequently
15  urged the parties to settle, and the parties were
16  interested in exploring settlement, and so there were
17  discussions that related -- related to settling the BCGI
18  litigation alone, that is, that would have resolved
19  the -- Freedom's claims against BCGI and Freedom's claims
20  against Cingular's use of BCGI but not resolve Cingular's
21  use of the Ericsson platform.
22         But I had other conversations with -- I
23  remember specifically with Mr. Pressman during the trial.
24  I know we had conversations in the hallway outside the
25  courtroom.  I believe we had at least one meeting at

18 (Pages 66 to 69)

Cingular Wireless LLC and Erickson Inc. vs. Freedom Wireless, Inc.
30(b)(6) Freedom Wirelss (Neal S. Berinhout) - 3/22/07

Page 74

1  my testimony.
2      Q.   Please repeat it, then.  What statements were
3  made?
4      A.   I don't intend to repeat the testimony that I
5  just provided.
6      Q.   I think you have to.
7          MR. DUNKELMAN:  Would you read it back?
8  Read back his entire answer, please.
9          MR. FELTER:  Well --
10         MR. DUNKELMAN:  Either that or --
11         MR. FELTER:  What, are you going to instruct
12 him not to answer my question?
13         MR. DUNKELMAN:  All right.  Try to answer
14 the question again.
15     Q.  BY MR. FELTER:  My question is, very clearly,
16 what statements were made by Freedom Wireless --
17 statements that made it clear to you that
18 Freedom Wireless's allegations of infringement were not
19 limited to the Cingular services that made use of the
20 BCGI services?
21     A.   If your question is asking me to state verbatim
22 what Mr. Pressman said and what I said, I'm unable to do
23 that.  I don't remember the precise language.  I just
24 told you that.  I don't remember the precise language.
25 What I do remember are the conversations, the gist of the

Page 75

1  conversations -- let me finish, please -- the subjects
2  that we discussed.
3          You want to call it my interpretation of
4  what he said.  It's not my interpretation of what he
5  said.  I was a party to the conversation.  And he and I
6  were conveying this information.  Again, if you want me
7  to tell you verbatim what he said, I cannot do that.  I
8  don't recall verbatim what he said.  What I do recall is
9  the gist of what he said and what I said, the
10 give-and-take, just as I testified at some length.  That
11 testimony won't change.
12     Q.   Okay.  Then, let's go back.
13         If you can provide the verbatim language, I
14 would ask for that.  If you cannot provide the verbatim
15 language, I would like you to give your best recollection
16 of what was stated.
17         So you say you can't provide any verbatim
18 language; is that correct?
19     A.   That is correct.
20     Q.   All right.  So now I'm going to ask you to give
21 your best recollection, as precisely as you can, of what
22 statements were made by Freedom Wireless.
23     A.   And I did that earlier.
24     Q.   I'm asking you to do it again.
25     A.   I'd like to confer with my counsel, because I

Page 76

1  think that's an abuse of a deposition.  I've just
2  finished answering your question.  I provided a lengthy
3  answer because your question was broad, and now you're
4  simply saying do it all over again.
5          MR. DUNKELMAN:  Let me talk with him.
6          (Recessed from 12:05 p.m. to 12:06 p.m.)
7          THE WITNESS:  Let me supplement the --
8      Q.  BY MR. FELTER:  There's a pending question.
9      A.   Well, that's what I'm --
10         MR. FELTER:  Would you read back the
11 question that's before the witness?
12         (Question at page 75, lines 20-22 read.)
13     Q.  BY MR. FELTER:  Please answer that question.
14     A.   I believe I have largely answered that
15 question, and so what I'm now saying is -- is a
16 supplement to what I've previously said.
17         Mr. Pressman conveyed to me that
18 Freedom Wireless contended that Cingular's use of the
19 Ericsson platform violated its two patents, the two
20 patents that were at issue in Freedom I.
21         Mr. Pressman conveyed to me that unless
22 Cingular obtained the license that was -- that was
23 Cingular's license, that is, not simply relying upon BCGI
24 obtaining a license, that unless Cingular obtained its
25 own license, Cingular would be exposed to Freedom's

Page 77

1  contentions that Cingular's use of the Ericsson platform
2  infringed its patents.
3          Mr. Pressman conveyed to me his view that
4  Cingular should be willing now -- "now" meaning at that
5  point, March and April of 2005 -- to enter into
6  negotiations with Freedom Wireless to obtain such a
7  license.
8          Mr. Pressman conveyed to me that if Cingular
9  did not secure a license, that Freedom Wireless
10 would be suing Cingular and Ericsson with respect to
11 Cingular's use of the Ericsson platform and contend that
12 that use of the platform infringed Cingular -- excuse
13 me -- infringed Freedom's patents.
14         So, essentially, as I recall, Mr. Pressman
15 conveyed to me that Cingular -- you have a choice:  Reach
16 a global settlement now that will allow you to extinguish
17 your exposure in Freedom I and avoid a lawsuit from
18 Freedom Wireless against Cingular and Ericsson for
19 Cingular's use of the Ericsson platform or continue
20 discussions possibly to settle only the Freedom I and
21 face subsequent litigation in which Freedom Wireless
22 would sue Cingular and Ericsson, contending that our use
23 of the Ericsson platform infringed their patents, or
24 engage in no settlement discussions whatsoever, and we
25 simply would continue the trial that was proceeding in

20 (Pages 74 to 77)

Cingular Wireless LLC and Erickson Inc. vs. Freedom Wireless, Inc.
30(b)(6) Freedom Wirelss (Neal S. Berinhout) - 3/22/07

Page 78

1  Boston, and, at some point following that, Cingular --
2  excuse me -- BCGI would bring its lawsuit against
3  Cingular and Ericsson.
4      Q.  You didn't mean BCGI, did you?
5      A.  Did I say BCGI?  I don't know what I -- I
6  didn't mean BCGI would sue.  If I said that, I meant
7  Freedom would sue BCGI and Ericsson.
8      Q.  Now, have you exhausted your memory regarding
9  what statements you say Freedom Wireless made during the
10  trial that made it clear to you that the allegations of
11  infringement were not limited to Cingular's services?
12      A.  Well, that, coupled with the answer I had
13  provided earlier.
14      Q.  I want you to -- because -- is there anything
15  else that -- other than what you just testified to --
16  that you want to add upon which you base this allegation?
17      A.  Yes.  I want to add the previous testimony that
18  I provided when you asked me the same question.
19      Q.  Well, you mentioned five things just now.
20          Is there anything in addition to those five
21  things you want to add?
22      A.  I'm not sure I agree I just said five things.
23          But, again, I believe I have, through the
24  testimony I provided the last several minutes in response
25  to this question, including the testimony I provided

Page 79

1  earlier in response to this question, I think I have
2  responded.
3      Q.  Okay.  What positions did Freedom Wireless
4  allegedly advance before trial upon which you base this
5  allegation?
6      A.  Well, quite frankly, I'm not sure that I -- in
7  my oral testimony that I've provided, I'm not sure that I
8  would draw any distinction between positions advanced and
9  statements made.  I was covering both.  I know that in my
10  declaration, I refer to statements made and positions
11  advanced, but I think I've covered both.
12      Q.  Is there anything else you wanted to add
13  regarding positions you haven't already testified about?
14      A.  Up to the trial.
15      Q.  Okay.  Then -- well, let's start before trial.
16  Do you want to add anything?
17      A.  No.  I -- I'm sorry.  I just meant -- I mean,
18  there are other statements and positions that Freedom
19  conveyed post-trial, but I believe I have told you all
20  that I can recall regarding the pretrial and the period
21  during trial.
22      Q.  Okay.  And that -- I was just referring to that
23  particular part of your declaration.
24      A.  Yes.
25      Q.  So just so we're clear, as far as the pretrial

Page 80

1  and the during trial segment, have I exhausted your
2  testimony?
3      A.  Well, it's certainly possible if I reviewed
4  some documents, that might refresh my recollection.  But
5  without reviewing those documents, that's what I recall.
6      Q.  Would you take a look at, again, paragraph 5,
7  line 20.  Do you see the sentence that begins "Cingular
8  had begun offering pre-paid wireless services that made
9  use of systems provided by Ericsson, and Freedom Wireless
10  made it clear that its claims of infringement with
11  respect to the '067 and '823 Patents, particularly its
12  allegations as to the scope of these patents, were broad
13  enough to include the Cingular services based on Ericsson
14  systems"?
15          Did I read that correctly?
16      A.  You did.
17      Q.  Just for one moment, the statements that you
18  allegedly -- that you attributed to Mr. Pressman, were
19  any of those ever in writing?
20      A.  And you're specifically focusing on just
21  Mr. Pressman's statements?
22      Q.  I'm sorry.  I thought I had asked you -- well,
23  let's start with Mr. Pressman, because if there's
24  somebody else, I'll ask you the question as well.
25          Did -- any of those statements that you

Page 81

1  attributed to Mr. Pressman, were there any of them in
2  writing?
3      A.  Well, let's see.  Some of the statements that
4  Mr. Pressman made were -- regarding Freedom's view of the
5  broad scope of its patents were also made in writing in
6  various pleadings that Freedom filed during the
7  litigation.  And some of the statements that Mr. Pressman
8  made are similar to statements that are in writing
9  that -- writings that were generated after the trial.
10          I also know that -- I know there was an
11  e-mail exchange between Mr. Pressman and myself in early
12  March of 2005 involving or setting up one of the
13  settlement discussions that he and I had in which he
14  wanted to discuss issues with Cingular without sharing
15  that discussion with BCGI counsel.
16          Those are the only writings that I can
17  recall.
18      Q.  Did you ever see anything in writing from
19  Mr. Pressman or anybody else in which Freedom Wireless
20  conveyed that Cingular's use of the Ericsson patent --
21  excuse me -- Ericsson system -- violated its patents?
22  Did you ever see anything in writing that conveyed that?
23      A.  Other than what I've already testified about?
24      Q.  I don't think you have.
25          Did you ever see anything in writing in

21 (Pages 78 to 81)

**E**

# *In The Matter of:*

### *ERICSSON INC. AND CINGULAR WIRELESS LLC*
### *VS.*
### *FREEDOM WIRELESS, INC.*

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

---

### *ROBERT ALAN PRESSMAN*

### *30 (b)(6) DESIGNEE FOR FREEDOM WIRELESS*

### *APRIL 6, 2007*

---

### *JD REPORTING, INC.*
### *CERTIFIED REPORTERS*

389 East Palm Lane
Phœnix, Arizona 85004
Phone: (602) 254-1345
Fax: (602) 254-2548
E-Mail address: JDREPORT@AOL.COM

**Word index included with this condensed transcript**

CONFIDENTIAL

ROBERT PRESSMAN                                                  April 6, 2007

---

**Page 21**

1    Q   Okay.  How many of these multi-party
2  discussions took place during the trial?
3    A   Do you mean -- can you be more clear as to the
4  trial?  Because there were two.
5    Q   Okay.  Let's say the spring of 2005.
6    A   I'm aware of -- I believe there was one
7  meeting.
8    Q   And was that meeting at Goodwin Procter?
9    A   Yes, it was.
10   Q   In terms of timing, when did that one meeting
11 occur in relation to the five discussions that you
12 referred to with Mr. Berinhout?
13   A   I think there may have been -- I'm not sure if
14 all the other discussions were before that meeting.  It
15 was probably a few before and a few after.
16   Q   Okay.  Let's go back to the discussions just
17 with Mr. Berinhout.  Are you able to distinguish in your
18 mind each of the five meetings, or is your memory just
19 sort of collectively of the five?
20   A   I can distinguish some of them at some levels.
21   Q   Okay.  At this time period during the time you
22 were discussing settlement with Mr. Berinhout, these
23 five discussions, was Freedom aware that Cingular was
24 employing prepaid wireless systems other than that
25 provided by BCGI?

---

**Page 22**

1    A   Yes.
2    Q   And specifically, was Freedom aware that
3  Cingular was using a system supplied by Ericsson?
4    A   You need to be more specific as to time.
5    Q   During the time period of your discussions
6  with Mr. Berinhout in 2005.
7    A   During the course of those, yes, I learned
8  that.
9    Q   Okay.  To the best of your recollection, what
10 did Mr. Berinhout say to you and what did you say to him
11 about settlement?
12      MR. FELTER:  Let me just put on the record I
13 would like to have these marked confidential.  Can we
14 have the agreement we had in the earlier deposition that
15 the transcript will be marked confidential?  Is that
16 okay?
17      MR. DUNKELMAN:  That's fine.
18   A   BY THE WITNESS:  Mr. Berinhout indicated that
19 he wanted a paid-up license.
20   Q   BY MR. DUNKELMAN:  That would include for what?
21   A   For anything that they did, any vendor, past,
22 present or future.
23   Q   Did he say anything else to you?
24   A   Yes.
25   Q   Okay.  What else did he say?

---

**Page 23**

1    A   I remember him discussing the fact that he was
2  indemnified by all of his vendors including BCGI.
3    Q   Did Mr. Berinhout tell you who the vendors
4  were?
5    A   Yes.
6    Q   Okay.  One of them would have been BCGI.
7  Correct?
8    A   Right.
9    Q   And one would have been Ericsson that he
10 mentioned.  Right?
11   A   Yes.  He told me Ericsson.
12   Q   Did he mention to you any other vendors other
13 than BCGI and Ericsson?
14   A   I don't believe so.
15   Q   Were you aware of any vendors other than BCGI
16 and Ericsson?
17   A   No.
18   Q   Is there anything else that you can recall
19 that Mr. Berinhout said to you during these five
20 settlement discussions?
21   A   I recall him telling me that Freedom should
22 provide Cingular and BCGI with a paid-up license for a
23 relatively modest fee so it could go off and try to
24 license other people.
25   Q   By "it," do you mean Freedom or --

---

**Page 24**

1    A   By "it," I mean Freedom.
2    Q   What do you recall telling Mr. Berinhout
3  during these five settlement discussions with him in
4  early 2005?
5    A   I recall telling Mr. Berinhout that Freedom
6  certainly would be willing to consider giving them a
7  paid-up license as he had requested.  I recall telling
8  him that we didn't have any information on any other
9  prepaid system used by Cingular other than BCGI.  I
10 recall making a specific offer for a prepaid license as
11 he had requested that we provide.
12      Did I say paid-up license or prepaid license?
13   Q   I think you said prepaid license.
14   A   I thought I did.  I meant to say a paid-up
15 license.  I'm sorry.
16   Q   What was the offer for a paid-up license that
17 you made to Mr. Berinhout?
18   A   What I recall in the offer is that a payment
19 up front of $60 million would provide a complete
20 across-the-board release and that royalties would be
21 payable up to a cap of an additional $90 million.
22   Q   And this royalty would be paid by Cingular on
23 its use of the BCGI system and the Ericsson system and
24 any other system that they might use?
25   A   That was what he requested, yes.

---

6 (Pages 21 to 24)

ROBERT PRESSMAN                                         April 6, 2007

| Page 41 |
|---|
| 1   to us by Mr. Berinhout. |
| 2       Q    And it's the only one you knew about.  Right? |
| 3       A    That's correct. |
| 4       Q    Okay.  What patent infringement claims did |
| 5   Freedom believe it may have at that time? |
| 6       A    At that time, I don't believe that Freedom |
| 7   knew that it had any patent infringement claims. |
| 8       Q    Well, if Freedom didn't believe it had any |
| 9   patent infringement claims against Cingular arising out |
| 10  of nonBCGI systems, why did you draft the first sentence |
| 11  of paragraph 17(a) the way you did? |
| 12      A    17(a) is an attempt to draft what was come up |
| 13  with in discussions between myself and the mediator, |
| 14  between the mediator and Cingular, between the mediator |
| 15  and BCGI.  And it was my attempt to draft the concept, |
| 16  but the concept grew out of the mediation. |
| 17      Q    Did you discuss during the mediation any |
| 18  claims that you might have -- that Freedom might have |
| 19  arising out of Cingular's use of nonBCGI systems?  Was |
| 20  that discussed? |
| 21      A    Not in that sense, no. |
| 22      Q    Wouldn't you agree with me, sir, that |
| 23  Cingular, reading the first sentence of paragraph 17(a), |
| 24  might interpret it -- it would be reasonable to |
| 25  interpret that Freedom believed that it might have some |

| Page 42 |
|---|
| 1   infringement claims against Cingular? |
| 2       MR. FELTER:  Objection.  Calls for |
| 3   speculation. |
| 4       A    BY THE WITNESS:  I would be speculating to try |
| 5   to figure out what was in Cingular's head. |
| 6       Q    BY MR. DUNKELMAN:  Why did you use the terms |
| 7   "allegedly infringed or infringe the Freedom patents" if all |
| 8   you were trying to do was to retrigger the negotiations over |
| 9   a paid-up license? |
| 10      MR. FELTER:  Objection.  That's inconsistent |
| 11  with his testimony. |
| 12      MR. DUNKELMAN:  Can you read the question? |
| 13      (The requested portion of the record was |
| 14  read.) |
| 15      A    BY THE WITNESS:  The concept of having the |
| 16  standstill, as I said, came out of the mediation, the |
| 17  discussions that all the parties were having with |
| 18  Judge Swartwood.  And as to why these particular words |
| 19  were chosen as opposed to any others, I think I would be |
| 20  speculating. |
| 21      Q    BY MR. DUNKELMAN:  But those words were chosen by |
| 22  you.  Correct? |
| 23      A    I don't recall how much of this I drafted from |
| 24  scratch or how much of it was sort of suggested by the |
| 25  mediator. |

| Page 43 |
|---|
| 1       Q    Okay.  Well, Cingular didn't draft 17(a), did |
| 2   it? |
| 3       A    Cingular didn't write this language.  That's |
| 4   correct. |
| 5       Q    Did they suggest this language? |
| 6       A    I'm not sure who suggested the concept.  The |
| 7   original concept of talking to Ericsson about things |
| 8   other than BCGI was suggested by Neal Berinhout. |
| 9       MR. FELTER:  Would you mind just reading back |
| 10  the last answer?  Because I believe there was just a |
| 11  mistake.  I think there was a reference to Ericsson.  I |
| 12  think the reference should be to Cingular.  But I want |
| 13  to make sure I didn't mishear it. |
| 14      (The requested portion of the record was |
| 15  read.) |
| 16      A    BY THE WITNESS:  I think that should be |
| 17  Cingular and Ericsson. |
| 18      Q    BY MR. DUNKELMAN:  So is it your testimony that |
| 19  you think that Mr. Berinhout proposed the idea of a |
| 20  standstill? |
| 21      A    Mr. Berinhout proposed the idea of setting up |
| 22  a meeting between Freedom and Cingular and Ericsson |
| 23  after the BCGI litigation was settled. |
| 24      Q    In any event, is it fair to say that one of |
| 25  the concepts of the standstill provision, once the |

| Page 44 |
|---|
| 1   agreement was signed, was to use the standstill period |
| 2   to discuss potential infringement claims with Cingular |
| 3   and Ericsson? |
| 4       A    The concept was to provide an opportunity for |
| 5   Freedom to get more information and figure out what to |
| 6   do from there. |
| 7       Q    What kind of information? |
| 8       A    Information about nonBCGI systems. |
| 9       Q    What information about nonBCGI systems was |
| 10  Freedom looking for? |
| 11      A    The way they operate and the extent of the |
| 12  use. |
| 13      Q    And to use that information to determine |
| 14  whether or not those systems infringed the patent. |
| 15  Correct? |
| 16      A    To use that information to determine whether |
| 17  or not a license would be necessary and appropriate. |
| 18      Q    A license would be necessary in Freedom's view |
| 19  if it believed the system fell within the claims of the |
| 20  patents.  Correct? |
| 21      A    I think that's the point of a negotiation, for |
| 22  the parties to collectively reach a conclusion and |
| 23  figure out what to do. |
| 24      Q    Now, if you would take a look at the second |
| 25  sentence of paragraph 17(a), is it a fair reading -- do |

11 (Pages 41 to 44)

**F**

0040507fv

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Cingular Wireless LLC and      )  No. CV06-1935 PHX JAT
Ericsson Inc.,                 )
                               )
          Plaintiffs,          )
                               )
     vs.                       )
                               )
Freedom Wireless, Inc.,        )
                               )
          Defendant.           )
                               )

RULE 30(b)(6) EXAMINATION OF ERICSSON INC.

FRANK VECELLA

CONTAINS CONFIDENTIAL INFORMATION

April 5, 2007
9:07 a.m.
Phoenix, Arizona

Prepared by:
Marianne S. Burton, RPR
Arizona Certified
Reporter No. 50519

Prepared for:

2

CONFIDENTIAL 30(b)(6) Ericsson (VECELLA) - 4/5/07

1                    I N D E X

2   WITNESS                              PAGE

Page 1

0040507fv

4    either late 2005 or early 2006.

5         Q.    Well, to try to put this in context, was there

6    some event that occurred that precipitated Mr. Han

7    calling Baker Botts?

8         A.    I don't think Mr. Han called Baker Botts.

9         Q.    I'm sorry.  I made an assumption.

10              Who called Baker Botts?

11        A.    I think I probably did.

12        Q.    Was there some event that occurred that

13   precipitated you to call them at that time?

14        A.    I wouldn't refer to it as an event as opposed

15   to a series of events.

16        Q.    Okay.  What were the series of events that

17   occurred?

18        A.    It would have been increased encouragement that

19   we received from our customer, Cingular, to engage

20   outside counsel to help represent Ericsson and Cingular

21   vis-a-vis Freedom Wireless.

22        Q.    Did Cingular tell you what caused them to

23   encourage you, increasingly encourage you to do that at

24   that time?

25        A.    Well, it wasn't just one time.  It was over a

GLENNIE REPORTING SERVICES, L.L.C.

19

CONFIDENTIAL 30(b)(6) Ericsson (VECELLA) - 4/5/07

1    period of time, yes.

2         Q.    What was the series of events that led them to

3    encourage you to do that?

4         A.    That we were going to get sued by

5    Freedom Wireless and that we ought to be prepared for

Page 17

0040507fv

6   that.

7        Q.     Did Cingular state to you or to Mr. Han what

8   led them to that belief?

9        A.     Yes.

10       Q.     What did they say?

11       A.     And you're just asking sort of holistically as

12   opposed to any particular meeting or communication?   Just

13   in general?

14       Q.     You said a series of events.

15       A.     Right.

16       Q.     I'm trying to understand what the series of

17   events were.

18       A.     Sure.

19              As early as the spring of 2005, when, as I

20   understand it, your Freedom Wireless I case was in trial,

21   Cingular was letting us know that -- wanted to make sure

22   that we were aware of that litigation, letting us know

23   that they were absolutely certain that Freedom Wireless

24   would be coming after the Ericsson/Cingular prepaid

25   wireless platform or service next and what should we be

GLENNIE REPORTING SERVICES, L.L.C.

CONFIDENTIAL 30(b)(6) Ericsson (VECELLA) - 4/5/07

20

1   doing about it to be proactive rather than just waiting

2   for the inevitable to happen.

3        Q.     Who at Cingular were you communicating with?

4   And by the way -- I should back up.

5              Do you realize you are here as a

6   Rule 30(b)(6) deponent designated by Ericsson?

7        A.     I do realize that.

0040507fv

8      Q.     So when I ask -- when I ask -- when I said what

9      do "you" do or what did "you" do, I'm asking you not only

10     what you did personally but what Ericsson did.

11            Do you understand that?

12     A.     I do understand that.

13            Being on this side of the table, I will tell

14     you that I find it more challenging than it might appear.

15     But I do understand that, and I'll do my best to answer

16     those questions for the company as opposed to just me

17     personally.

18            And your question was, who was I -- who was

19     Ericsson speaking with at Cingular?

20     Q.     Correct.

21     A.     I would say the two primary individuals were

22     Neal Berinhout and Chris Arena.

23     Q.     When you say the principal person, were there

24     other people at Cingular?

25     A.     Well, because of the way you've defined "you,"

GLENNIE REPORTING SERVICES, L.L.C.

21

CONFIDENTIAL 30(b)(6) Ericsson (VECELLA) - 4/5/07

1      I understand that there were, though I'm not sure I would

2      know their names, because I believe John Han was the

3      person between the two of us who had communications with

4      Cingular representatives beyond Neal Berinhout and

5      Chris Arena.  But those are the two individuals that I

6      recall having discussions with.

7      Q.     Is it accurate to state that the spring of 2005

8      was the first time that Ericsson became aware of the

9      Freedom Wireless I case?

Page 19

0040507fv

13     Q.    And how long did your conference or

14   conversation with Mr. Han on Tuesday last?

15     A.    Less than 15 minutes.

16     Q.    Would you let me -- please let me know what you

17   asked him.

18          MR. CARLSON:  I want him to answer this

19   question.  What I don't want to do is to get into some

20   sort of a trap where this is used to argue that there's

21   some sort of broader subject matter waiver.  I think this

22   is probably not privileged because it was for the purpose

23   of preparing for the 30(b)(6) deposition, but can I have

24   an agreement perhaps that there will not be an argument

25   that if I let him answer this question, that that creates

GLENNIE REPORTING SERVICES, L.L.C.

55

CONFIDENTIAL 30(b)(6) Ericsson (VECELLA) - 4/5/07

1   some sort of broader subject matter waiver?

2          MR. FELTER:  I'd be glad to agree that him

3   answering this specific question wouldn't constitute a

4   waiver.

5          MR. CARLSON:  All right.  Go ahead.

6          THE WITNESS:  The main reason I called him

7   was because in reviewing the documents that Ericsson

8   produced to Freedom Wireless, I noticed one e-mail in

9   which John Han was trying to set up a conference call,

10   and I was one of the recipients of the e-mail.  And I

11   believe that conversation took place, but I didn't have

12   any specific recollection of it.  And I asked Mr. Han if

13   he recalled whether I participated in that call or not.

14     Q.    BY MR. FELTER:  How did he respond?
                    Page 51

0040507fv

15    A.    He said he doesn't think that I did.

16    Q.    Okay.  What else did you talk to Mr. Han about

17    in order to prepare for this deposition?

18    A.    I asked him if he recalled any specific

19    communications with Cingular representatives in which I

20    was not a party that might have any bearing on the issues

21    that are embraced by your client's motion to dismiss.

22    Q.    And how did he respond?

23    A.    He said he couldn't really segregate one

24    particular conversation from another, but he believes

25    that he had at least one, maybe more, conversations,

GLENNIE REPORTING SERVICES, L.L.C.

CONFIDENTIAL 30(b)(6) Ericsson (VECELLA) - 4/5/07              56

1    communications with Cingular people, in which I was not

2    present, in which Neal Berinhout, in particular, gave him

3    certain assurances that it was inevitable that

4    Freedom Wireless was going to sue Ericsson and Cingular

5    for patent infringement.

6    Q.    Okay.  Did Mr. -- I'm just focusing for the

7    moment on your conversation on Tuesday with Mr. Han.

8    A.    Right.

9    Q.    What else did Mr. Han say to you during that

10    conversation?

11    A.    Well, when he said what I just relayed that I

12    said, I asked him if he could be more specific, and he

13    said he recalled Mr. Berinhout saying words to the effect

14    of he, Mr. Berinhout, was certain that Ericsson/Cingular

15    would be the next round of litigation for

16    Freedom Wireless.

Page 52

1    one, at some point in one of the first ones, the Cingular

2    representatives, whether it was just Mr. Arena or just

3    Mr. Berinhout or both of them, communicated to us that

4    Boston Communications Group, Inc., had provided the

5    previous generation, if you will, prepaid wireless

6    platform to Cingular, I believe for its TDMA network, and

7    because Ericsson was providing the newer generation

8    prepaid wireless platform for GSM, they thought we should

9    be aware of what was going on in that litigation in

10   Boston.

11       Q.    Okay.  I'm sorry, I don't understand.

12             If you were providing different systems or

13   different platforms, why would -- did Cingular explain to

14   you why you should know about it?

15       A.    Well, at some point maybe in that first

16   conversation, maybe not, the Cingular representatives

17   expressed to us that Freedom Wireless appeared to believe

18   that the claims of its patents were sufficiently broad to

19   cover not only the prepaid wireless platform provided by

20   Boston Communications Group, Inc., to Cingular but also

21   the Ericsson Cingular technology.

22       Q.    Did the folks from Cingular, either during this

23   initial conversation or later, provide the basis for

24   their statement that Freedom Wireless was making this

25   claim on the scope of their patents?

0040507fv

1     A.     Yes.

2     Q.     What did they say?  What did Cingular say?

3     A.     Yeah.  And those conversations I recall having

4  more with Mr. Berinhout than Mr. Arena.

5     Q.     Okay.

6     A.     And I recall a couple of things.  I recall that

7  he seemed to think that the discovery that

8  Freedom Wireless had propounded in that case was

9  sufficiently broad in scope to seem to be wanting to know

10  about the Ericsson system, not just BCGI, that the claim

11  construction arguments that the Freedom Wireless lawyers

12  in the Boston litigation were making seemed to be

13  calculated to be broad enough to try to cover systems

14  beyond just the BCGI system, and at some point he

15  communicated that that was clear to him that after that

16  litigation was concluded, Ericsson/Cingular would be -- I

17  forget whether he used the phrase "next round" or "next

18  wave of litigation," but that it was inevitable that

19  Freedom Wireless would then set its sights on Cingular

20  and Ericsson.

21     Q.     Did you, meaning Ericsson, ever receive any of

22  the discovery that Mr. Berinhout or Mr. Han -- not Han --

23  Mr. Berinhout or Mr. Arena were talking about?

24     A.     Discovery, no.

25     Q.     Or -- I'm just going through your testimony.

GLENNIE REPORTING SERVICES, L.L.C.

CONFIDENTIAL 30(b)(6) Ericsson (VECELLA) - 4/5/07


1              You said he mentioned -- this is

0040507fv

4   Mr. Weatherford did as well.

5   Q.   Do you know whether, after the review of the

6   Markman order, they came to any conclusion of whether

7   Ericsson's platform with Cingular would be covered?

8            MR. CARLSON:  Well, I'm going to instruct

9   the witness not to answer.  I think those kinds of

10  internal analyses would be privileged.

11           MR. FELTER:  Well, first of all, it's just a

12  yes or no question.

13           MR. CARLSON:  Well, all right.  I'm going to

14  let you answer if you know whether they came to a

15  conclusion or not.  If there was a conclusion, you should

16  not disclose the substance of that conclusion because

17  that's privileged.

18           THE WITNESS:  Okay.

19           I think certain conclusions were made.

20  Q.   BY MR. FELTER:  Okay.  Now, those conclusions

21  that were made after reviewing the Markman order, are you

22  going to rely on that in any way to argue that

23  Freedom Wireless was going to sue Ericsson, that you

24  believe Freedom Wireless was going to sue you?

25  A.   I don't believe so.

GLENNIE REPORTING SERVICES, L.L.C.

                                                    98

CONFIDENTIAL 30(b)(6) Ericsson (VECELLA) - 4/5/07

1   Q.   So you're not going to rely on the claim

2   construction or your, Ericsson's review of the claim

3   construction as a basis for asserting subject matter

4   jurisdiction; is that right?

5   A.   Right.

0040507fv

6      Q.      And then you said -- the third thing, you said

7   Mr. Berinhout said that it was clear to him that the next

8   round of litigation would be involving Ericsson or it was

9   inevitable, right?

10      A.      Correct.

11      Q.      Did Mr. Berinhout tell you why he thought or

12   why it was clear to him or why it was inevitable?

13      A.      Yes.  At different points in time, he gave us

14   different reasons why he believed that.

15      Q.      Can you tell me the best memory of all the

16   reasons he gave?

17      A.      Well, one of the first ones that he gave was

18   that he, on behalf of Cingular, was attempting to

19   explore, and perhaps all the parties to the Boston

20   litigation were exploring settlement possibilities.  And

21   he communicated to us that in the attempt to obtain for

22   Cingular, as part of a settlement with Freedom Wireless,

23   a release, it became very, very clear to him that

24   Freedom Wireless was not willing to consider giving

25   Cingular a complete release, but would insist on limiting

GLENNIE REPORTING SERVICES, L.L.C.

99

CONFIDENTIAL 30(b)(6) Ericsson (VECELLA) - 4/5/07

1   it to a release of Cingular only to the extent that it

2   was using a platform provided by Boston Communications

3   Group, Inc.

4      Q.      Anything else that Mr. Berinhout or anybody

5   else from Cingular stated was their -- a basis for their

6   conclusion that there would be additional litigation

7   against Ericsson?

Page 92

0040507fv

8    A.    Are you talking about in the early spring of

9  2005 or at any time?

10    Q.    Well, let's start with the early spring --

11  let's start during the trial.

12    A.    The jury trial?

13    Q.    The jury trial.

14    A.    The main things I remember, Mr. Felter, during

15  that time were how anxious Cingular was to know what our

16  position would be on indemnity.

17    Q.    I can imagine.

18    A.    That it was crystal clear to Cingular that

19  Freedom Wireless would not consider releasing Cingular

20  generally.  They wanted to preserve their right to go

21  after Cingular for Cingular's use of the Ericsson

22  platform, and at some point, though probably not in the

23  first communication, Mr. Berinhout indicated that he

24  thought Ericsson ought to come up to Boston and

25  participate in settlement discussions with the other

GLENNIE REPORTING SERVICES, L.L.C.

100

CONFIDENTIAL 30(b)(6) Ericsson (VECELLA) - 4/5/07

1  parties, including Freedom Wireless.  I remember that.

2              And the comments that I made earlier that he

3  felt that the discovery that was being propounded was

4  sufficiently broad that Freedom Wireless appeared to

5  think that -- appeared to be interested, let's put it

6  that way -- in learning what it could about Cingular's

7  use of the Ericsson platform.

8    Q.    Okay.  Anything else?  Can you think of

9  anything else that Mr. Berinhout or anybody else from

Page 93

0040507fv

10    Cingular gave as a reason for their belief that there was

11    going to be additional litigation involving --

12                 MR. CARLSON:  Is your question still limited

13    in time in terms of the jury trial period?

14                 MR. FELTER:  Yes.

15                 THE WITNESS:  Those are the things that I

16    recall right now.

17    Q.      BY MR. FELTER:  Okay.  I'll ask you if you do

18    recall anything else before the deposition is over, you

19    let me know.

20        A.    Okay.

21        Q.    You also mentioned during either this first

22    conversation or early on that one of the things that

23    Cingular wanted to talk about was indemnification.

24                 Do you recall what Mr. Arena said or asked

25    about the issue of indemnification?  This is during

GLENNIE REPORTING SERVICES, L.L.C.

CONFIDENTIAL 30(b)(6) Ericsson (VECELLA) - 4/5/07                101

1    either the first conversation or the early conversation.

2        A.    My best recollection is that Chris Arena --

3    Chris Arena was sort of John Han's counterpart, and

4    Mr. Berinhout was sort of mine.  Chris Arena, I gathered,

5    was more of a technical patent lawyer type person, who

6    seemed much more interested in talking about technical

7    issues, and Mr. Berinhout seemed more interested in the

8    indemnity issue than Mr. Arena.

9        Q.    Okay.  Well, maybe I should ask the question.

10    What did Mr. Berinhout ask about the indemnification

11    issue?  And, again, I'll just, for the moment, focus on

Page 94

0040507fv

12   the jury trial period.

13        A.    Well, as I said, at some point he invited us to

14   basically come to the party and voluntarily appear in

15   settlement discussions in this litigation, and emphasized

16   to me and probably also to Mr. Han, if Ericsson isn't

17   participating in those discussions, there's no way that

18   Cingular is going to get a release from Freedom Wireless

19   that would be broad enough to cover the Ericsson/Cingular

20   prepaid wireless solution, and if so -- and so if you,

21   Ericsson, don't come up here and, you know, basically

22   bring your checkbook and participate in those

23   discussions, then we will have no choice but to fend off

24   another lawsuit that will be filed against Ericsson and

25   Cingular by Freedom Wireless.

GLENNIE REPORTING SERVICES, L.L.C.

102

CONFIDENTIAL 30(b)(6) Ericsson (VECELLA) - 4/5/07

1         Q.    You also testified that either during this

2    initial conversation or soon thereafter, Cingular was

3    asking about or they wanted to get an understanding of

4    the Ericsson platform; is that correct?

5         A.    Yes.

6         Q.    What, if any, steps did Ericsson take or

7    Cingular take in order to get an understanding of the

8    platform?

9         A.    I know that Mr. Han and Mr. Arena had telephone

10   conversations between themselves to discuss the technical

11   aspects of the Ericsson prepaid wireless platform.  And I

12   believe that at some point, Mr. Arena actually came

13   from -- I'm assuming he's based in Atlanta -- came from

Page 95

1    the kind of thing he and I, in our respective roles, are
2    always interested in knowing about.
3        Q.    You also testified that he shared his concerns,
4    he wanted to share his concerns with Ericsson.  Why?
5                MR. CARLSON:  Objection; repetitious.
6                THE WITNESS:  Either in this first
7    conversation or in one of the conversations I had with
8    Mr. Berinhout, I distinctly recall us discussing the
9    indemnity issue, which we talked about already, and also
10   this issue of whether Ericsson ought to be willing to
11   come up to Boston and participate in settlement
12   discussions with Freedom Wireless.
13               I honestly don't recall whether he was
14   thinking that that would be under some official mediation
15   process or more informal settlement discussions with the
16   parties or both.
17       Q.    BY MR. FELTER:  And you also stated that either
18   in this first conversation or sometime during the trial,
19   he expressed or he said to you that he was confident that
20   Freedom Wireless would bring some lawsuit against
21   Cingular and Ericsson.  Is that correct?
22       A.    Yes.
23       Q.    Did he indicate to you or state to you or
24   Ericsson why he was so confident?
25               MR. CARLSON:  Objection; repetitious.

0040507fv

1              THE WITNESS:  Beyond what I've already
2       testified to?
3          Q.    BY MR. FELTER:  Yes.  So what you testified to
4       awhile ago, the same reasons?  Is there anything in
5       addition to what you've already testified about?
6          A.    I think I've shared with you the various
7       reasons he mentioned.
8          Q.    And before I asked you just kind of limiting it
9       to the jury trial period.
10             Was there any additional reasons that
11      Mr. Berinhout ever gave you why he believed Freedom
12      Wireless would bring a lawsuit based on the Ericsson
13      platform, other than what you've already testified?
14         A.    In other words, including at later points in
15      time?
16         Q.    Correct.
17         A.    Yes.
18         Q.    What additional reasons or basis for that did
19      he give?
20         A.    Well, I don't recall, you know, verbatim what
21      he said, but I had the strong impression that either
22      representatives of Freedom Wireless or perhaps others
23      involved in the case had made it clear to Mr. Berinhout
24      that Freedom Wireless would be pursuing claims against
25      Ericsson and Cingular.  He also -- at some point, I

GLENNIE REPORTING SERVICES, L.L.C.

127

CONFIDENTIAL 30(b)(6) Ericsson (VECELLA) - 4/5/07

0040507fv

1  believe there were discussions about the statements that
2  were made by attorneys for both Freedom Wireless and
3  Boston Communications Group shortly after the jury
4  verdict in May of 2005 that Mr. Berinhout cited as
5  reinforcing his belief in that regard.
6          I also recall, I think it was in the maybe
7  June of 2006 time frame, Mr. Berinhout sharing with us
8  the fact that as part of some settlement discussions that
9  were going on at that time, Freedom Wireless was
10  proposing that Freedom Wireless and Cingular enter into a
11  standstill agreement that, in Mr. Berinhout's view,
12  reinforced his belief that he had had all along, that
13  Freedom Wireless intended to bring claims against
14  Ericsson and Cingular.
15          And I believe in that same general time
16  frame, I believe I recall Mr. Berinhout sharing with me
17  rulings that the Court in Freedom Wireless I had made
18  that Freedom Wireless wanted vacated as a condition of
19  any settlement of that litigation, which also, in
20  Mr. Berinhout's view, underscored that Freedom Wireless
21  intended to come after Ericsson and Cingular next.
22      Q.    Okay.  Have I exhausted your memory of what
23  Mr. Berinhout said to you why he believed
24  Freedom Wireless would bring an action based on the
25  Cingular/Ericsson system?

GLENNIE REPORTING SERVICES, L.L.C.

128

CONFIDENTIAL 30(b)(6) Ericsson (VECELLA) - 4/5/07


1      A.    Between those things and the things I've
2  mentioned to you previously today, I think -- there may
Page 119

0040507fv

3    be others, and if I think of them, I'll be happy to tell

4    you.

5        Q.    Appreciate that.

6              Now, let's -- you said that you got the

7    impression, based on statements that Mr. Berinhout made

8    to you, that Freedom Wireless had made statements that

9    led him to believe that there was going to be a lawsuit.

10             Did Mr. Berinhout ever tell you what

11   Freedom Wireless representatives said to him or to

12   anybody else, for that matter?

13       A.    I think what I said earlier was that

14   Mr. Berinhout gave me the impression that either

15   Freedom Wireless representatives or others involved in

16   the case had shared with him the opinion that

17   Freedom Wireless intended to pursue claims against

18   Ericsson and Cingular.

19       Q.    Right.  And I wasn't trying to cut you off, but

20   I wanted just to focus on things that Freedom Wireless

21   representatives might have said or allegedly said.

22             Did Mr. Berinhout ever relay to you anything

23   that Freedom Wireless said that led him, Mr. Berinhout,

24   to believe that they would file a lawsuit based upon the

25   Ericsson/Cingular platform?

GLENNIE REPORTING SERVICES, L.L.C.

129

CONFIDENTIAL 30(b)(6) Ericsson (VECELLA) - 4/5/07

1        A.    Things that Freedom Wireless representatives

2    said to anyone or that they said to Mr. Berinhout

3    personally?

4        Q.    Let's take Mr. Berinhout first, and then we'll

Page 120

0040507fv

15    the only other prepaid wireless system that Cingular used

16    other than the BCGI system that was the subject of that

17    case was the system provided to Cingular by Ericsson.

18    And that, I think, reinforced Mr. Berinhout's belief from

19    the fact that Freedom Wireless was not willing to --

20    apparently to give Cingular in settlement discussions a

21    release that would be broad enough to cover any and all

22    prepaid wireless systems that Freedom Wireless was

23    specifically reserving the right to go after Cingular and

24    presumably also Ericsson for the prepaid wireless

25    platform that Ericsson provided to Cingular.

GLENNIE REPORTING SERVICES, L.L.C.

135

CONFIDENTIAL 30(b)(6) Ericsson (VECELLA) - 4/5/07

1      Q.    BY MR. FELTER:  Okay.  I don't want to ask you

2     to repeat testimony.  I just want to make sure that I

3     have your entire testimony.

4            This on line 17 says that "Freedom Wireless

5     also contended that its patents were sufficiently broad

6     in scope that they would cover Cingular pre-paid wireless

7     services that used non-BCGI systems."

8            Now, was there anything other than the fact

9     that Freedom Wireless was not going to give a release of

10    the Ericsson/Cingular platform --

11           MR. CARLSON:  Had you finished your

12    question?

13     Q.    BY MR. FELTER:  -- that Mr. Berinhout based

14    this contention on?

15           MR. CARLSON:  All right.  I'm going to

16    object as repetitious.  We covered this in length this

0040507fv

17   morning.

18         But answer this if you can.

19         THE WITNESS:  Yeah, although I will tell you

20   that this now refreshes my recollection of one other

21   thing that I don't have specific recall about.

22         I recall Mr. Han, who is a technical person,

23   an engineer by background and a patent lawyer, none of

24   which would aptly describe me, asking Mr. Berinhout

25   specific questions about claim construction issues in the

GLENNIE REPORTING SERVICES, L.L.C.

                                              136

CONFIDENTIAL 30(b)(6) Ericsson (VECELLA) - 4/5/07

1    Boston litigation, and Mr. Han -- and I promise you I'm

2    not trying to be evasive.  I'll just tell you that I was

3    a history major and a French minor, and when patent

4    lawyers start talking about claim construction, there's

5    some part of my brain that just turns off.  And as

6    John Han was asking Mr. Berinhout and probably Mr. Arena

7    questions about claim construction, Mr. Han got the

8    impression, as I recall, from the claim construction

9    positions that Freedom Wireless was taking in the Boston

10   litigation as were relayed to Mr. Han by Mr. Berinhout

11   and/or Mr. Arena, Freedom Wireless was trying to

12   interpret its patent claims broadly enough to cover

13   systems other than the BCGI system.  And since we knew

14   and Cingular knew that the only other system that

15   Cingular used that wasn't a BCGI system was the Ericsson

16   system, that reinforced Mr. Berinhout's belief and

17   Mr. Han's belief that Freedom Wireless would likely

18   allege that the Ericsson platform that Cingular uses also

Page 127

0040507fv

19    was covered by its patents.

20        Q.    BY MR. FELTER:  At any time -- during any time

21    during the jury trial, did Mr. Berinhout or anybody from

22    Cingular ever tell you that anybody from Freedom Wireless

23    said that they were going to bring litigation against the

24    Ericsson/Cingular platform?

25        A.    I don't remember Mr. Berinhout using those

GLENNIE REPORTING SERVICES, L.L.C.

137

CONFIDENTIAL 30(b)(6) Ericsson (VECELLA) - 4/5/07

1    exact words.

2        Q.    Well --

3              MR. CARLSON:  Had you finished your answer?

4    Go ahead.  I'm sorry.

5              THE WITNESS:  Yes.

6        Q.    BY MR. FELTER:  Or in substance even if he

7    didn't use those exact words.  In other words, I'm trying

8    to clear up.

9              You said they had the impression.  I want to

10    know if Mr. Berinhout or anybody from Cingular ever told

11    you or anybody at Ericsson that Freedom Wireless had said

12    that they intended to bring a lawsuit based on the

13    Ericsson/Cingular system.

14        A.    Specifically, when Mr. Berinhout was trying to

15    get Ericsson to agree to participate in settlement

16    discussions in that case, I believe that Mr. Berinhout

17    either stated or strongly implied that Freedom Wireless

18    had made it clear to Cingular that it intended to come

19    after Ericsson and Cingular unless Cingular was willing

20    to pay more money than it was prepared to pay to get a

Page 128

0040507fv

21  release that would only cover its use of the BCGI

22  platform.

23      Q.    Okay.  I just want to make sure I get the

24  distinction, though.

25              Is it accurate to state that Mr. Berinhout

GLENNIE REPORTING SERVICES, L.L.C.

138

CONFIDENTIAL 30(b)(6) Ericsson (VECELLA) - 4/5/07

1  never said that Freedom Wireless made such statements?

2              MR. CARLSON:  Objection; repetitious.

3              THE WITNESS:  No.  I'm telling you that he

4  may have said exactly that, and that's certainly the

5  impression that I got.  But I can't swear to you that he

6  affirmatively represented that a Freedom Wireless

7  representative stated, in exactly those words, that it

8  would sue Ericsson and Cingular.

9      Q.    BY MR. FELTER:  Again, I'm not trying to limit

10  to exactly those words, to that substance.

11              Can you recall him ever saying that

12  Freedom Wireless representatives, in substance, said

13  that?

14      A.    He may have said that.

15      Q.    You have no present memory?

16      A.    Not beyond what I've told you about now many

17  times.

18      Q.    Okay.  Again, I'm just trying to draw a

19  distinction between -- you used the word "impression" or

20  "inferred."  I'm trying to draw a distinction between

21  that and statements attributed to Freedom Wireless.

22              Can you recall any statements attributed to

Page 129

G

**Bramson & Pressman**
1100 E. Hector Street
Suite 410
Conshohocken, PA 19428
Phone: 610-260-4444
Fax: 610-260-4445

December 19, 2005

Patrick J. Sharkey, Esq.
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, MA 02111

Re:    Rule 408 Material - Confidential

Dear Pat:

I am writing in response to your letter dated December 16, 2005 which arrived at my office late Friday afternoon. As I told you last week when BCGI first made its offer subject to a drop dead date of December 19 (or, as you put it, Cingular's money would "disappear"), my client contact was occupied with personal matters this weekend. As a result, the December 19 deadline was singularly unhelpful.

First, we disagree with your view that the CAFC's decision is a clear warning to Freedom Wireless. It is undisputed that the CAFC has not previously addressed joint infringement, and the question is becoming increasingly important in today's interconnected world. The patent law provides protection for systems and methods. And, direct infringement is required for there to be a finding of contributory infringement or inducement of infringement. Thus BCGI's argument that there is no such thing as joint infringement, if adopted, would leave a massive hole in the patent law where two unrelated parties could infringe a patent by simply agreeing to divide up the claim elements. There is no support for the existence of such a hole from either a statutory or policy perspective.

BCGI's fallback corporate control test is no test at all. If there is corporate control, one of the parties is simply an alter ego of the other party and, in that case, there is direct infringement by virtue of the acts of the party jointly with his agent. There is no need to reach the question of joint infringement when one party has corporate control over the other party. Furthermore, BCGI's corporate control test, as opposed to the more general control test that it advocated at trial, is a newly minted argument that first appeared in BCGI's appellate briefs. Perhaps, BCGI is having a difficult time developing a general control test that its joint activities with Cingular would not exceed by a wide margin.

The CAFC's decision turned on "substantial question" rather than "likelihood of success." Notably, Don Dunner's other arguments on the merits did not even justify a single sentence in the opinion. Rather, the CAFC appeared to be convinced that, in the

Patrick Sharkey, Esq.
December 19, 2005
Page 2

absence of a stay, BCGI would not be around long enough for the CAFC to definitively address the joint infringement question. As a practical matter, the CAFC decision does little to remove the cloud over BCGI as any carrier that continues as a customer of BCGI will be running the substantial risk of being found to willfully infringe Freedom's patents. Moreover, BCGI and Cingular have together taken steps to put Cingular in a preferential position in the event of the repeatedly threatened BCGI bankruptcy further limiting the value of BCGI's indemnification.

It is also important to note that the position of the parties has changed significantly since we were unable to reach a settlement agreement this summer. At that point, key Freedom witnesses on the inequitable conduct issue had not yet testified, there was no well reasoned opinion on inequitable conduct, a final judgment had not been entered, Freedom had not entered into two license agreements, and the damages had not been enhanced by more than Forty Million Dollars. Nevertheless, our understanding is that Cingular agreed to contribute a small fraction of the settlement amount in July and recently agreed to put that same money (but not one penny more) on the table for just a few days. During our settlement discussions, it became clear that Cingular cared little for what happened to BCGI and was looking forward to a new fight against Freedom where it was being indemnified by a deeper pocket. Unfortunately, notwithstanding the fact that Cingular was aware of the Freedom patents at least as early as BCGI and made 1.4 Billion Dollars in revenue to BCGI's 100 Million, Cingular's settlement strategy, consistent with its damage theory, is that it is free to infringe as long as someone else pays the bill. Having spent nearly six years in litigation to get to the point where Freedom has a judgment against Cingular that the Freedom patents are infringed, valid, and enforceable, Freedom is not prepared to give Cingular the ability to have a chance to start from scratch on someone else's nickel.

Accordingly, we are prepared to make the following non-binding offer which is contingent on working out a number of issues that remained open in our prior discussions and agreeing on definitive documentation by December 31, 2005 (unless extended by mutual agreement of the parties):

a)      Payment of $82 million in the aggregate from BCGI and certain of its carrier customers.

b)      A license effective January 1, 2006 with royalty rates consistent with our most recent license. No grace period will be provided and the agreement will need to be drafted in a way that guarantees that BCGI will pay royalties when due, without the need to re-litigate exactly which BCGI products and services are royalty bearing.

c)      The defendants in what is now being referred to as "Freedom Wireless I" must agree that (1) the jury verdict as to infringement of the BCGI implementations shall be final and binding and (2) the verdicts of validity and enforceability shall be final and binding.

**Confidential**

ASM000210

Patrick Sharkey, Esq.
December 19, 2005
Page 3

We believe that the approach outlined above at a high level fairly balances the respective interests of the parties. It provides an approach for BCGI to resolve all outstanding matters and have a license going forward. Moreover, the settlement amount is at a substantial discount to the adjudicated (let alone potential) damages. At the same time, Freedom is assured that it will not have to re-litigate issues other than infringement with Cingular.

If the approach described above is unacceptable to Cingular, we continue to be willing to explore a "Bucket 2" type settlement and have some creative ideas to bridge the financial gap.

After you have a chance to review this letter with your client, please get back to me promptly.

Sincerely yours,

Robert A. Pressman

RAP/ck

cc:     Freedom Wireless, Inc.
        Quinn Emanuel Urquhart Oliver & Hedges, LLP
        Goodwin Procter, LLP

**Confidential**

ASM000211